**Robert R. RUHLMANN, Plaintiff,**

v.

**ULSTER COUNTY DEPARTMENT OF SOCIAL SERVICES, Ulster County Department of Mental Health, Marshall Beckman, Ernest Townsend, Benedictine Hospital, Ruth McGregor, Dr. Joel Ginsberg, Dr. Kevin Smith, and Dr. Diana Puglisi, Defendants.**

No. 99–CV–0213.

United States District Court, N.D. New York.

Nov. 26, 2002.

Chamberlain, Kaufman & Jones, Attorneys for Plaintiff, Albany, NY, Alan S. Kaufman, of counsel.

McCabe & Mack, LLP, Attorneys for Defendants Ulster County Department of Social Services, Ulster County Department of Mental Health, Marshall Beckman, and Ernest Townsend, Poughkeepsie, NY, David L. Posner, of counsel.

O'Connor, O'Connor, Mayberger & First, P.C., Attorneys for Defendants Dr. Kevin Smith and Dr. Diana Puglisi, Albany, NY, Jodie L. Sayers, of counsel.

Thuillez, Ford, Gold & Johnson, LLP, Attorneys for Defendants Benedictine Hospital, Ruth McGregor, Dr. Joel Ginsberg, and Dr. David Steres, Albany, NY, Debra J. Young, of counsel.

### MEMORANDUM–DECISION and ORDER

HURD, District Judge.

### INTRODUCTION

Plaintiff Robert Ruhlmann ("plaintiff"), brings this suit against defendants Ulster County Department of Social Services ("DSS"), Ulster County Department of Mental Health ("DMH"), Marshall Beckman ("Beckman"), Ernest Townsend ("Townsend"), Benedictine Hospital ("Benedictine"), Ruth McGregor ("McGregor"), Dr. Joel Ginsberg ("Ginsberg"), Dr. Kevin Smith ("Smith"), Dr. Diana Puglisi ("Puglisi"), and Dr. David Steres ("Steres"), alleging six causes of action.

In his *first, third,* and *fourth* causes of action, plaintiff alleges, as against all defendants, that defendants caused his illegal arrest and involuntary confinement in Benedictine Hospital in violation of his due

process rights and right to be free from false arrest/imprisonment under the federal and New York constitutions, and under New York law.

In his *second* and *fifth* causes of action, plaintiff alleges, as against DSS, that he was constructively discharged because of his disability in violation of the American with Disabilities Act and New York Executive Law.

In his *sixth* cause of action, plaintiff alleges, as against Benedictine, McGregor, Steres, Ginsberg, Smith and Puglisi, that defendants, as physicians and designee of the Director of Community Services, breached a duty of reasonable care to plaintiff in failing to use their knowledge, skill, and care to properly determine whether the arrest and confinement mandates of the New York Mental Hygiene Law were met.

Plaintiff has moved for summary judgment on the *first, third, fourth,* and *sixth* causes of action.[1] All defendants have moved for summary judgment on all claims pending against them. Oral argument was heard on November 30, 2001 in Albany, New York. Decision was reserved.

## FACTUAL BACKGROUND

The facts are very much in dispute. The following account of the facts represents a composite taken from the parties' submissions.

### I. THE PARTIES

*Plaintiff.* Beginning in November of 1995, Plaintiff was employed at DSS. Plaintiff's direct supervisor was Maryanne Razey, and Razey's supervisor was Linda Sharpe. When plaintiff's employment at DSS ended is in dispute. Defendants con-

tend plaintiff resigned on May 19, 1998. (See Joint Exhibit 73). Plaintiff maintains such resignation was involuntary, and that he was constructively discharged.

*Defendants.* Benedictine is a privately owned and operated hospital in Ulster County, New York. At all relevant times, McGregor, a psychiatric mental health nurse, was employed by Benedictine as coordinator of the psychiatric emergency room. As a result of a contract between Ulster County and Benedictine, McGregor was also Townsend's "designee" under Mental Hygiene Law § 9.45. Ginsberg and Steres worked as physicians in the emergency room at Benedictine, and Ginsberg was the director of emergency medicine at Benedictine. Smith, a psychiatrist, was medical director of mental health services at Benedictine. In that capacity, Smith was responsible for providing physicians to Benedictine. Smith was not employed by Benedictine, DSS, or DMH. Puglisi was a staff psychiatrist at Benedictine and was not employed by Benedictine, DSS, or DMH.

DSS and DMH are governmental entities of the State of New York, and are both located in Ulster County, New York. At all relevant times, Townsend was the commissioner of DMH and Beckman was the deputy director for administration of DMH. Townsend was also director of community services under New York Mental Hygiene Law § 9.45.

Townsend had a professional relationship with Smith. Ulster County began a contractual relationship with Benedictine in 1995. This contract essentially transferred responsibility for 24-hour emergency mental health services from DMH to Benedictine. After the contract was exe-

---

1. Plaintiff, in his moving papers, also contends that his right to confidentiality to his medical records and his right to access to his medical records have been violated. These issues will be considered under Part IV of the Discussion, *infra*.

cuted, most pick-up orders under Mental Hygiene Law § 9.45 were issued by Benedictine employees.

## II. *ALLEGED FACTS*

### A. *Alleged Events Prior to March 24, 1998*

Plaintiff came under the care of Dr. Surjit Dinsa, a licensed psychiatrist, in April of 1997. Dr. Dinsa's diagnosis of plaintiff through late January of 1998 was that he had "depressive disorder NOS [not otherwise specified]." In February of 1998, Dr. Dinsa diagnosed plaintiff with bipolar mood disorder, instructed plaintiff to begin taking prescription lithium, and gave him a note telling plaintiff's employer that plaintiff could not, at present, work. (See Joint Exhibit 72). Dr. Dinsa also recommended that plaintiff voluntarily enter a hospital. According to defendants, such recommendation to enter the hospital was for treatment. Plaintiff contends that it was so plaintiff could get rest and not have to attend to his own needs. Plaintiff did not voluntarily admit himself to a hospital.

Around the same time, plaintiff alleges that he told Linda Sharpe of his mental illness and that he was taking medication. According to plaintiff, Sharpe told him that if he had such a diagnosis and was on medication, then he was dangerous and should not be working at DSS. Plaintiff took a leave of absence from work from February of 1998 to early March of 1998. Plaintiff alleges the leave was taken so he could adjust to his new medication. Plaintiff claims that upon return from the leave of absence, Delores Miller, Deputy Commissioner of DSS, Razey, and Sharpe were trying to find an excuse to fire him.

### B. *Alleged Events of March 24, 1998*

### 1. *The alleged threat*

Karen Hof, a DSS employee, claims she had a conversation with plaintiff the morning of March 24, 1998. Hof alleges plaintiff made a comment indicative of animosity towards certain DSS employees. Hof could not recall exactly what plaintiff's comment was, but intimated it was something to the effect of "there's people in here that better watch out." (Hof Depo. at 22). According to Hof, no mention was made of the words "gun," "administration," or "supervisors," and she felt the comment to be "benign and non-threatening." (See Hof Depo. at 22,38,41).

### 2. *Hof–Hunlock conversation*

According to plaintiff, Hof was then asked by Marijane Hunlock, a supervisor at DSS who happened to be passing Hof's desk when the conversation was taking place, what she and plaintiff had spoken about. Hof then recalled in more specificity the content of plaintiff's comment. Hunlock claims a scared Hof approached her cubicle and told her that plaintiff had made the comment, "it would be easy to take out the administration—no one would know," that plaintiff's comment involved the threat of "a potential violent act," and that it involved a "gun" and a "potential harm to the administration." (See Hunlock depo. at 6; Joint Exhibits 48 and 49). Hunlock's characterization of the conversation with Hof was embodied in two separate writings made a few days later, though plaintiff claims these writings were coerced. The parties disagree as to whether Hunlock viewed the statement as a valid threat, but both agree she characterized it as a potential safety concern. Later in the day on March 24, 1998, Hunlock decided to speak with Doris Dodig, Hof's supervisor, about the incident.

### C. *Alleged Events of March 25, 1998*

### 1. *Conversation between Hunlock–Dodig and Hof*

On March 25, 1998, Hunlock called Hof to her office and asked her to repeat to

Dodig the contents of plaintiff's comment. Hof complied. Hof claims she reiterated in that meeting that the comment was not a threat and that "if anything was said in that direction it was a joke and we were kidding around." (Hof depo. at 25). Hof did, however, indicate that she did not wish to be involved in the matter any further because she claims to have seen "witch hunts" at DSS, where persons were essentially driven out. (Hof depo. at 45,-47).

### 2. Conversation between Hunlock–Dodig and Reynolds

Dodig and Hunlock did not feel comfortable reporting the incident to DSS, so they contacted their union, which they believed would be fair. During the latter part of the day, Dodig and Hunlock reported the statement to Sandra Reynolds, a union official. They told Reynolds of their desire for anonymity. Though Reynolds could not recall the exact words relayed to her by Hunlock, she does claim it was something to the effect of "taking out" the administration at DSS. (Reynolds depo. at 21). Reynolds had no recollection of the mention of guns or a plan to shoot people, or of specific names.

### 3. Reynolds–DeCicco conversation

Reynolds thereafter called Deborah DeCicco, another union official, and relayed what Hunlock and Dodig told her. According to DeCicco, Reynolds told her that plaintiff "had a gun, a plan and his plan was to come in the [DSS] and shoot the Commissioner, the Deputy Commissioner and Lee Cane." (DeCicco depo. at 18).

### 4. Conversation between Reynolds–DeCicco and Miller (plaintiff's version)

DeCicco then called Miller and relayed what Reynolds told her. DeCicco claims

Miller urged that the three meet, which they did. The meeting was "short, maybe fifteen minutes" long. (DeCicco depo. at 25). DeCicco repeated to Miller what she claims Reynolds told her. According to Reynolds, Miller was informed that it was unclear if the statement was said or not and that Reynolds and DeCicco did not want anyone's reputation harmed, but that they did not want to ignore what they perceived as potential danger. According to DeCicco, Miller was interested in obtaining the identity of the person to whom the comment was relayed (Hof), but did not ask either DeCicco or Reynolds to find out. DeCicco claims Miller suggested that she contact Beckman.

### D. Alleged Events of March 26, 1998

### 1. DeCicco–Miller conversation (defendants' version)

Miller's recollection of the events is quite different. She claims she first learned of the alleged comment later in the work day on March 26, 1998, during a break in a labor meeting attended by DeCicco. According to Miller, DeCicco followed her into the ladies room and told her that plaintiff "had made statements . . . that he had a gun and he was going to take out Lee Cane, Linda Sharpe, and starting with them and then administration." (Miller depo. at 36). Plaintiff claims DeCicco had no recollection of Sharpe's name being mentioned by Reynolds. According to Miller, she asked DeCicco who had told her that information. DeCicco informed Miller she could not answer that question. Miller claims that the subject of DeCicco calling either Beckman or Townsend never arose. DeCicco has no recollection of this conversation.

### 2. Conversation between DeCicco and Beckman–Townsend

DeCicco called Beckman, but she is unsure of when the call took place. Accord-

ing to DeCicco, she told Beckman that an employee had come to Hunlock and said that plaintiff "had a gun and a plan and the plan was to shoot the Commissioner, the Deputy Commissioner and Lee Cane," and that Miller had suggested she contact him about it. (DeCicco depo. at 28). DeCicco claims her conversation with Beckman lasted a few minutes. At some point, Townsend joined the conversation, and Beckman passed on to him the information DeCicco provided.

According to Townsend and Beckman, DeCicco called the morning of March 26, 1998. Beckman claims DeCicco told him that plaintiff "had made a threat within his work area to other employees of the area; that the threat concerned, and I'll use the term blowing away because that's how I remember it, the administration in Social Services Department; that the employees who heard the complaint were terrified, and that's my word to describe how she made it sound to me, that they were extremely frightened; they didn't want [plaintiff] to know who they were and therefore were afraid to step forward and make a complaint, that the information had been communicated through their supervisor to Debby and they were asking for somebody to do something." (Beckman depo. at 23). He further claims DeCicco made "a general statement that the employees said they were aware that [plaintiff] had weapons in his house," and that the threat was made on March 26, 1998. (Beckman depo. at 26).

Townsend claims he asked DeCicco if there were any credible factors that would substantiate the threat, and that her reply was that "it was alleged that plaintiff had guns." (Townsend depo. at 27). Specifically, according to Townsend, there occurred an incident of "people going to [plaintiff's] house once to see if he was okay and knocking on the windows and

[plaintiff] saying you shouldn't do that, I have a gun and you could get hurt if you startle me like that." (Townsend depo. at 40). Towsend claims DeCicco told him that the employees who heard the alleged comment were concerned and scared, "that they thought that he, you know, had the means to do it. There was some talk about them being frightened, so frightened that they didn't want to take it up the supervisory channel . . ." (Townsend depo. at 35).

### 3. *Townsend–Smith conversation*

Townsend placed a phone call to Smith between 3:00 and 3:30 p.m. Smith claims Townsend asked him a variety of questions about the options available to him in responding to the "phone calls he had gotten from [DSS] saying that they were frightened for their safety, that there was an individual at work who was making specific verbal threats of killing individuals at DSS and bombing DSS." (Smith depo. at 41). Smith also claims Townsend told him "that the individual had been a recipient of services as far as, as he recalled through [DMH] in the recent past [and] that he wasn't sure at that moment in time if he had a history of previous violence or if he had a history of prior threats of violence." (Id.). Smith claims that Townsend told him that he was aware of plaintiff's mental health history, and that he was an unhappy employee who perceived discrimination against him because of his mental illness. He claims Townsend also told him of "allegations" that plaintiff had firearms or access thereto. (Id.). Plaintiff maintains this conversation was not just an opportunity for Townsend to become aware of his options, but, rather, to ensure that the pick-up order was issued.

Smith claims he asked Townsend whether anyone had reported that plaintiff had weapons with him at DSS or anything that

could be considered a bomb. According to Smith, Townsend answered in the negative, but persisted in asking Smith what options were available to him. Smith claims he told Townsend he had several options available, one of them being that "if he knew that the individual had a mental illness and that threats of dangerousness were potentially a part of that illness that a pick-up order could be issued to have the person brought in for evaluation in the ER to better assess whether that was the case." (Smith depo. at 43).

#### 4. *Smith–McGregor conversation*

Smith, after his conversation with Townsend, called McGregor and told her of the call from Townsend. Smith claims he told McGregor that if Townsend so chose, he or someone from DMH would be "contacting the emergency room to issue the pick-up order." (Smith depo. at 41–42).

#### 5. *Conversation between Townsend–Beckman and Miller–Decker*

Townsend claims he spoke to Miller some time after the conversation with De-Cicco. He claims Miller told him that plaintiff had recently returned from medical leave, which was taken for mental health reasons. Townsend and Beckman claim to have also tried several times without success to contact plaintiff's private psychiatrist, Dr. Dinsa. According to Miller, she tried to contact Dr. Dinsa at least three times as well, also without success. Beckman and Townsend claim to have made "numerous contacts" with DSS to assure themselves that nothing untoward was happening at DSS. (Beckman depo. at 39).

According to Miller, however, there was only one contact between Townsend and Beckman and DSS, a telephone call lasting about fifteen to twenty minutes at 3:30 p.m. on March 26, 1998. DSS Commis-

sioner Glenn Decker entered Miller's office during this conversation. Beckman told Miller that DeCicco had called him and told him what Miller claims DeCicco told her in the ladies room earlier that day. The conversation also included, according to Miller, discussion of the fact that DSS knew plaintiff had a gun. Miller claims this was "known" because of a conversation she had with Maryanne Razey in which Razey told her of the incident when the two employees went to plaintiff's house, and because people at DSS were aware plaintiff had a gun.

Miler also claims she told the others of a disturbing visit plaintiff paid to a psychology intern at DMH during plaintiff's leave of absence. Plaintiff denies that such visit was disturbing. She also claims she told them of a 1997 confrontation between plaintiff and Sharpe, which resulted in a disciplinary memo being placed in plaintiff's file. Plaintiff denies that this specific incident was discussed, but does admit that Miller may have used such incident as a basis for describing plaintiff as explosive during the meeting.

Decker first learned of the alleged threat in Miller's office. He remembers the threat as "directed at the administration of [DSS] beginning with the commissioner's office." (Decker depo. at 22). Decker claims that Townsend and Beckman had said DeCicco had gone to them for guidance on how to proceed. Decker let it be known to Beckman and Towsend that he was in on the conversation, and that he may have mentioned he was going to notify his security officers. Decker also inquired as to plaintiff's whereabouts at the time of the phone conversation.

According to Decker, Townsend and Beckman informed Miller and Decker that they took the alleged threat seriously and that "they believed that [plaintiff] needed to be examined." (Decker depo. at 30).

Though Decker suspected that Beckman and Townsend were going to request a pick-up order, neither of the two actually told him so. According to Beckman, he and Townsend learned nothing to indicate that plaintiff's behavior had reached the point where he was threatening at that point in time, as he was not currently "menacing people, or anything like that." (Beckman depo. at 30). Beckman claims Townsend told DSS to try to persuade the persons who heard the alleged threat to come forward in order "to develop the seriousness of the threat." (Beckman depo. at 35).

Beckman trusted DeCicco totally based on how she had dealt with past threats to staff members. Townsend believed the threat was credible based on the alleged fear of DSS employees, the nature of the threat, and his sensitivities to workplace violence due to knowledge of some recent "workshop killings." (Townsend depo. at 38). Though Townsend claims his prior dealings with DeCicco were "fleeting" he found her to be credible. (Townsend depo. at 34).

#### 6. *Townsend–McGregor conversation*

Townsend and Beckman claim they believed that something had to be done about the situation before the end of the day. Townsend claims he called McGregor and told her he "wanted her to issue a pick-up order on [plaintiff] because the commissioner of [DSS] reported to [him] that [plaintiff] has threatened to kill people in the administration and that [plaintiff] has a history of mental illness and that [Townsend] ha[d] been unable to contact [plaintiff's] psychiatrist." (Townsend depo. at 70). Townsend told McGregor that he may have used the phrases "blow away" and "blow up." (Id. at 73). Townsend told McGregor something to the effect of

"let's issue a pick-up on" plaintiff. (Id. at 84).

According to McGregor, Townsend informed her of threats plaintiff made to "blow away people at DSS," and of plaintiff's history of psychiatric disorder. (McGregor depo. at 28–29). McGregor claims she probed Townsend for specific names and dates of threats, but was told that the specific information was not in front of him at that moment. Plaintiff maintains that this conversation took place at 3:55 p.m. McGregor claims that prior to issuing the pick-up order, she unsuccessfully attempted to contact Dr. Dinsa. Around 4:00 p.m., Townsend told Beckman that McGregor indicated to him that she would issue the pick-up order.

Townsend is a certified social worker, but had provided no treatment personally to plaintiff, and he told McGregor nothing that would lead her to that conclusion. McGregor had no other information about plaintiff except that provided by Townsend and allegedly provided by Smith.

#### 7. *(Second) McGregor–Smith conversation*

After her conversation with Townsend, McGregor called Smith and asked if he felt Townsend was a proper "reporter" under Mental Hygiene Law. According to plaintiff, Smith told McGregor he felt Townsend fit the category of a social worker currently providing treatment services to plaintiff because, as director of community services, Townsend was responsible for providing care and treatment to all citizens of the county. According to defendants, Smith told McGregor that Townsend fit into the category of "health officer." According to Benedictine, McGregor, Steres, and Ginsberg, Townsend as Commissioner of Mental Health could request the issuance of a pick-up order.

McGregor claims to have believed that plaintiff needed "immediate care and treatment ... in a hospital for mental illness," such care and treatment being a "mental health evaluation." (McGregor depo. at 62–63). Townsend claims he needed "structure" and "perhaps medication and observation." (Townsend depo. at 94). According to plaintiff, McGregor said that specific information was not crucial to the decision to evaluate plaintiff. Defendants claim specific information was not necessary because of Townsend's reliability as a reporter.

### 8. Issuance and execution of pick-up order

The actual pick-up order was signed by McGregor at 4:45 p.m., directing members of the Kingston Police to take plaintiff into custody and transport him to Benedictine. (Joint Exhibit 2). The heading stating the authority under which the order was issued read: " § 9.45 Mental Hygiene Law. Request By A Director of Community Services or Designee." McGregor placed her name in the blank immediately preceding the words, "am the designee of the Director of Community Services for Ulster [County]." The form indicates that the information providing the basis of the issuance of the order came from "Ernest Townsend, who is ... a licensed psychologist or certified social worker currently responsible for providing treatment services to the person."

The Kingston police department dispatch records indicate that the police arrived at plaintiff's house at 5:15 p.m. to execute the pick-up order. (Joint Exhibit 6). According to plaintiff, he was, at the time, washing his kitchen floor. The dispatch records state that plaintiff's pick-up was on orders "issued by Dr. Townsend of Mental Health." Defendants claim this notation is erroneous. According to plain-

tiff, the officers informed plaintiff there was a problem at Benedictine and he was wanted there. Plaintiff claims that as he went upstairs to retrieve a shirt to put on the officers grabbed him by the wrist, handcuffed him behind his back and dragged him out of the house. Defendants deny this occurred. Plaintiff was placed in the back of the officers' police car and transported to Benedictine. Though denied by defendants, plaintiff contends the officers did not inform him as to the reasons for his pick-up, were unresponsive to questions, and did not ask him about the alleged threats.

### 9. McGregor's evaluation of plaintiff

According to plaintiff, upon arrival at Benedictine, he was taken to the emergency room and placed in an examining room. At approximately 6:00 p.m., McGregor went to speak with and evaluate plaintiff. McGregor's examination was brief due to plaintiff's uncooperative demeanor and his refusal to give prior psychiatric history. McGregor found plaintiff's motor activity as normal, his eye contact as good, and his appearance as neat. She also found he was oriented in time, place, and person, and was not depressed. She found his thought process organized and without psychotic content.

Her report indicated that "[plaintiff] reportedly verbalizes his wanting to blow up DSS," but that plaintiff was "clueless as to why he is here." (Joint Exhibit 8). McGregor alleges she told him that he was there because of threats to blow up DSS, but provided him with no specific details surrounding the alleged threat, including when it was made, who heard it, and where it was made. The parties disagree as to whether or not plaintiff had his legal rights and status explained to him. The evaluation ended at 6:15 p.m., fifteen minutes after it began. Plaintiff claims

McGregor left the room without explaining to him what would happen next, without telling him she would be speaking with Smith, without telling him he would be given a physical by an emergency room physician, and without explaining the standard applied when determining whether to admit plaintiff.

### 10. (Third) McGregor–Smith conversation

After leaving plaintiff's examination room, McGregor spoke to Smith via telephone. She described her examination, but does not remember whether she filled in her report before or after speaking to Smith. According to plaintiff, Smith told her to admit plaintiff, saying that "due to the seriousness of the threats and that specific people were threatened," plaintiff should be admitted involuntarily to the mental health unit "for further evaluation." (See Joint Exhibit 5; McGregor depo. at 77,128). According to plaintiff, McGregor told Smith she thought admission was proper and he agreed. According to defendants, Smith only recommended that plaintiff be admitted. Plaintiff claims McGregor told Smith that, according to Ginsberg, plaintiff was medically clear. All parties seem to agree that Ginsberg never examined plaintiff. Smith prescribed medication for plaintiff, which McGregor documented.

### 11. Smith–Ginsberg conversation

According to plaintiff, Smith spoke to Ginsberg immediately following his conversation with McGregor in order "to verify the medical clearance." Plaintiff claims Ginsberg gave Smith an indication that plaintiff would be admitted. According to plaintiff, Ginsberg told Smith the medical clearance data was "normal and fine," and Smith came away from this conversation satisfied with medical clearance. Accord-

ing to some defendants, Ginsberg claims he never spoke with Smith about plaintiff. Smith's alleged conversation with Ginsberg was approximately five minutes long.

### 12. Smith and McGregor conversations with secure psychiatric unit

After speaking with Ginsberg, plaintiff claims Smith called the secure psychiatric unit to "let the nurses know that the patient was going to be admitted and gave them telephone orders for his admission." Plaintiff claims that, at 6:15 p.m., the same time her examination of plaintiff ended, McGregor made a verbal report to a nurse in the secure psychiatric ward that plaintiff would be admitted. According to plaintiff, at 6:30 p.m., McGregor called plaintiff's insurance carrier to inform them of the admission.

### 13. Ginsberg's signing of Mental Hygiene Law § 9.39 admission form

Also at 6:30 p.m., plaintiff claims Ginsberg signed the admission form to admit plaintiff involuntarily under Mental Hygiene Law § 9.39. (Joint Exhibit 10). Plaintiff claims McGregor completed the mental health evaluation form by 6:50 p.m.

Though it appears all parties agree that Ginsberg never examined plaintiff, his usual evaluations in these situations take fifteen minutes to an hour and encompass both physical and mental health examinations. This examination would include asking the patient about alcohol or substance abuse history, whether the patient had thoughts of hurting himself or others, prior medical or psychiatric history. The course of the examination would be determined by the answers to those questions.

### 14. Benedictine regulations on status and rights and signing of consent form

Benedictine regulations require that a patient admitted to the mental health unit

receive both a verbal and written explanation of the patient's status and rights, and that a copy of the written explanation be forwarded to mental hygiene legal services. Plaintiff claims he was never given the written copy, that there is no copy in plaintiff's medical record produced by the hospital, and that mental hygiene legal services received no copy. According to defendants, a patient is also asked to sign a consent form, and that the admitting nurse reads the status and rights form with the patient. Defendants claim plaintiff received paperwork from the admitting nurse but does not recall what those papers were or what he did with them.

At or around 6:50 p.m., plaintiff signed his consent to "hospitalization, routine and/or emergency care." (Joint Exhibit 13). Among other things, the form states that plaintiff consents to "customary care," and has had his "rights and responsibilities (as a patient in the hospital)" explained to him in a manner he can understand, and that plaintiff "ha[s] had the opportunity to ask questions about this consent and they have been answered to my satisfaction." Notably, plaintiff checked neither the "yes" nor the "no" options next to either statements.

### 15. *Steres' examination of plaintiff*

According to plaintiff, beginning at 7:15 p.m., Steres gave plaintiff a physical examination. Plaintiff claims Steres asked him some questions about his medical history, but none about the alleged threat, and that even had he asked plaintiff such questions, it would have made no difference because Steres claims to have had the information about the threat from what he considered to be reliable sources, and that he could not "take the risk" of taking just believing plaintiff. (Steres depo. at 85). Steres found plaintiff to be alert, oriented, cooperative, and interactive, with no mania, agita-

tion, paranoia, delusions, or hallucinations. Steres also found plaintiff was medically stable. Plaintiff claims Steres did ask plaintiff he was depressed, to which plaintiff responded in the negative. According to plaintiff, Steres made no determination that plaintiff needed immediate care or treatment for a mental illness, only that "it wasn't safe to release to him." (Steres depo. at 37). The examination lasted ten minutes, and Steres signed the § 9.39 admission form at 7:30 p.m. (Joint Exhibit 10).

According to plaintiff, Steres concluded that plaintiff was a danger to others based only on what was written on the medical records in plaintiff's chart when Steres examined plaintiff. Steres claims he did not make an attempt to corroborate the information in the medical records because he "basically had to go on—trust the people who sent in the pick-up papers were acting on good faith." (Steres depo. at 39–40). Plaintiff claims Steres told him nothing of what would occur next or that anything had been decided regarding his admission. At no time did Steres speak with Smith regarding plaintiff's admission. According to plaintiff, he also did not speak with McGregor. Plaintiff was taken to the secure psychiatric ward of Benedictine and held overnight.

### E. *Alleged Events of March 27, 1998*

### 1. *Puglisi's initial meeting with plaintiff*

Some time between 10:00 and 10:30 a.m. on March 27, 1998, plaintiff met with a treatment team headed by Puglisi. The purpose of the meeting was to "evaluate the reason for [plaintiff's] admission, to explore what was going on, to do a mental status examination and to assess any risk factors that there might be for [plaintiff's], for any possibility of danger to himself or others at that point and, if so, continue the

hospitalization. If it was felt in our clinical judgment that the danger was minimal, to discharge [plaintiff]." (Puglisi depo. at 32). It is not in dispute that Puglisi had only that information contained in plaintiff's chart. Defendants claim, however, that she asked plaintiff about said information, including the alleged threat. Plaintiff claims no additional details about the threat were provided to him by Puglisi.

According to plaintiff, he told Puglisi he should not be at Benedictine, and that he had no intent to harm anyone at DSS. According to plaintiff, Puglisi claims plaintiff "indicated to us at that time also that part of his history that he had been diagnosed as bipolar recently within the past year and had just returned from disability to his job." (Puglisi depo. at 38). Plaintiff claims he told the team that he felt that people at DSS were holding his mental illness against him. At the meeting, plaintiff claims he denied any homicidal or suicidal thoughts. Puglisi claims that she told plaintiff that the team did not "have so far in [their] exploration any reason to believe that [plaintiff] might actually have made [the threat]" and that they "would be planning for [plaintiff's] imminent discharge." (Puglisi depo. at 53–54). Plaintiff left the room.

### 2. *Treatment team discussion of plaintiff*

Thereafter the team discussed the case. According to plaintiff, Puglisi felt there were no signs of plaintiff having psychomotor agitation or any other symptoms commonly associated with mania. According to plaintiff, Puglisi claims she determined that plaintiff's "initial mental status was contradictory to the accusations of statements that he had made, the behavior he threatened." (Puglisi depo. at 52–53). Plaintiff admits Puglisi did have doubts, however, as to his guardedness and relia-

bility. According to plaintiff, the team's plan was to obtain "collateral interviews" and, if they panned out, to discharge plaintiff as soon as possible. (Puglisi depo. at 58).

### 3. *Puglisi–Smith conversation*

After meeting with plaintiff and her team, Puglisi spoke with Smith. According to plaintiff, Smith informed her that he had been on the phone prior to her calling him. She claims Smith told her he "had gotten a lot of, had had a lot of concern regarding threats that had apparently been made by [plaintiff]. [Smith] had gotten a history of these threats to blow up [DSS]. [Smith] had gotten some history of [plaintiff] having weapons and being within eyesight of [DSS] and apparently had, it had been conveyed to [Smith] some concern that [plaintiff] may merit more exploration at this point." (Puglisi depo. at 56).

### 4. *Smith–Beckman conversation*

According to plaintiff, after Puglisi told him that plaintiff was denying he made the threats, Smith called Beckman and asked for more specifics about the alleged threats. He called DMH because he had learned that no specific information had yet been learned and, as it was a Friday, he felt getting those specifics would be difficult. Smith was worried about the expiration of the "48–hour hold" placed on plaintiff that would expire around 6:30 p.m. on Saturday, March 28. "[S]o in order to retain [plaintiff] until the following workday we would have to confirm a[§ ] 9.39." (Smith depo. at 77). Smith claims Beckman told him that he, Beckman, was "doing the best that he could." (Id.). According to Smith, Beckman told him people at DSS were afraid for their safety, but were afraid of reprisal from plaintiff if they put something in writing.

### 5. Smith-treatment team conversation

Plaintiff claims Smith conveyed this information to the treatment team. The parties dispute whether Smith mentioned weapons. It is not disputed that Smith told Puglisi the information he had received the previous night from Townsend and about the level of concern that existed at DSS. Puglisi felt it important to the decision whether to confine plaintiff under § 9.39 to determine whether the alleged threats had been made, as her practice was to obtain "actual documentation" of such things. (Puglisi depo. at 159). Puglisi admits that all the information in her and Smith's possession as of March 27, 1998, was "secondhand hearsay information." (Puglisi depo. at 82–83,91). Defendants claim that efforts were being made, however, beginning in the morning on March 27, to verify the information.

### 6. Hunlock–Miller meeting and Hunlock–Decker conversation

In the early morning on Friday, March 27, 1998, Hunlock agreed to come forward, and she and Reynolds went to see Miller. Hunlock claims she told Miller of her actions and that she felt reporting the matter was the responsible thing to do. Decker (of DSS) came to see Hunlock briefly that same morning. She claims that she told him she was upset with the way things were going because she did not believe it was an immediately dangerous situation. Decker claims he told her that if she had information she should share it with the police.

### 7. Beckman–Benedictine conversations

That same day, conversations occurred between hospital officials, including Smith, and Beckman and Miller regarding plaintiff and his status. Smith requested more information. Beckman made several calls to Benedictine that day. According to Beckman, he was trying to reach either McGregor or Smith. According to plaintiff, Beckman was told by Benedictine that plaintiff was consistently denying making the threats, that he appeared stable, and that observation was continuing. Plaintiff claims that Beckman was also told that plaintiff did not appear to meet the criteria for continued involuntary hospitalization. Plaintiff claims that Beckman asked to be informed prior to any discharge of plaintiff.

### 8. The decision to continue plaintiff's confinement and second Puglisi-plaintiff meeting

Puglisi claims that she and Smith decided to continue plaintiff's involuntary hospitalization. Although admitting plaintiff denied making the threats, Puglisi was concerned about plaintiff's "guardedness" and "reliability," and that, at that time, she "didn't know if he was progressing towards another manic break or not." (Puglisi depo. at 56–57). She also claims Smith told her they had another day to confirm the § 9.39 admission. She claims that they decided to spend the rest of the weekend monitoring plaintiff and exploring his behavior.

Some time between the end of her first meeting with plaintiff and 3:00 p.m., Puglisi met with plaintiff and informed him of the decision to continue his confinement. Puglisi claims she told plaintiff that although his discharge had been "planned," they were detaining him over the weekend because of a "growing" concern and her belief that plaintiff may have been "less than candid" in their initial meeting. (Puglisi depo. at 79). According to plaintiff, Puglisi told him they had received information from Beckman that contradicted plaintiff's denials. Plaintiff claims Puglisi

told him that Beckman had conveyed the information to Kathleen Voss, a social worker at Benedictine who was part of plaintiff's treatment team. Though Puglisi cannot remember if specific details were told to plaintiff, she does recall that he was told generally that Beckman had given them information that caused her concern. She told plaintiff he would have to remain in the secure psychiatric unit until the "apparent[ly] terroristic threats" could be explored, noting that such exploration entailed contacting the parties reporting the threats and assessing "risk." (Puglisi depo. at 89–90). This meeting lasted approximately five minutes and was cut short by Puglisi after plaintiff became angry about the decision to continue his confinement.

### 9. *Signing of consent form for release of information*

Voss also obtained plaintiff's signature on a form entitled "consent for release of information." (See Joint Exhibit 7). The form authorized Benedictine to release to DSS certain information. Plaintiff may have been confused as to the form's purpose—which was to allow disclosure of information from Benedictine to DSS—because he wrote: "only to receive from DSS as to the date, time, quote of allegations and for nothing else. DSS is not allowed to receive any information about me at all." Plaintiff's signature was obtained on an identical form, allowing disclosure to DMH, with no written restrictions.

### 10. *Hunlock–Miller conversations and subsequent Hunlock written statement*

Around 3:00 p.m. on March 27, 1998, plaintiff claims Hunlock received a phone call from Miller, who informed her that Beckman wanted a statement and that if she did not give such a statement she could be in trouble or even arrested. Initially, Hunlock claims she resisted. After being called back by Miller, however, she claims she wrote one so as not be insubordinate. The statement was general, stating that she was informed of a comment made by plaintiff involving a "potential violent act," and that because she was uncertain of what to do, she and another supervisor contacted their union representative. (Joint Exhibit 48). Puglisi did not see this statement prior to her deposition.

### 11. *Puglisi's signing of Mental Hygiene Law § 9.39 form for continued confinement*

Puglisi signed the "psychiatrist's confirmation" on the back of the § 9.39 admission form at 3:30 p.m. (Joint Exhibit 10). On the form, she notes that plaintiff denied making the threats, but that he showed "soft signs of impending psychomotor agitation when told he will be in for observation." Under "psychiatric signs and symptoms," Puglisi wrote "questionable reliability, history of bizarre behavior at work." She also noted plaintiff showed a "tendency" to cause harm to others, citing his threat "to bomb DSS and kill personnel." Under "mental status," she wrote, *inter alia*, history of bipolar manic episode." According to Puglisi, the immediate care and treatment plaintiff needed was lithium and "safety and containment to rule out any impending exacerbation in light of his escalating angry behavior." Per hospital regulations, Puglisi dictated plaintiff's history and physical examination, reiterating much of the same. (Joint Exhibit 27). She also noted that the plan was to observe plaintiff and obtain collateral interviews to further explore the veracity of the alleged threats, "since the DSS did request the Mental Health Commissioner to be warned if the patient is discharged since they are in fear of his acting out."

#### 12. *Decker letter placing plaintiff on paid leave*

Also at some point on March 27, 1998, Decker drafted a letter placing plaintiff on paid leave pending a psychiatric evaluation. (Joint Exhibit 52). The evaluation was to be conducted to determine if plaintiff had the ability to return to work. An examination was scheduled for May 18, 1998.

### F. *Alleged Events of March 30, 1998*

On March 30, 1998, a Monday, Puglisi decided to release plaintiff. She based the decision on her belief that plaintiff gave no indication during confinement of "any escalating behavior" or of "an episode of the illness progressing to decompensation," and on her belief that "DSS and Marshall Beckman were not able to verify to us that any such statements had really been made," despite being provided "ample time" to provide such information. (Puglisi depo. at 124–25). Puglisi claims she concluded that if plaintiff made the alleged threat, it was not from any psychosis. In the hospital records, Puglisi wrote that plaintiff was in "good psychomotor control all weekend," and that there was no indication of any psychosis. She also noted that DSS and Beckman had been informed of the discharge. (Joint Exhibit 25). In her discharge summary, she noted that the treatment team had contact with DMH and DSS prior to discharge. Puglisi was apparently referring to a phone conversation, later recorded in notes, between Voss and Miller, during which Voss informed Miller that plaintiff was being discharged and that Benedictine would not be notifying the police.

### G. *Alleged Events After March 30, 1998*

#### 1. *Letter of plaintiff to Decker*

On April 1, 1998, plaintiff sent a letter to Decker acknowledging he received, read, and was disheartened by Decker's letter of March 27, 1998. (Joint Exhibit 58). In the letter, plaintiff expresses regret that anyone at DSS felt threatened, but categorically denies ever saying anything threatening that may cause such feelings. Decker received this letter on April 7, 1998.

#### 2. *Disciplinary charges against plaintiff*

On April 27, 1998, while plaintiff was on paid leave, Miller levied disciplinary charges against plaintiff, alleging plaintiff "repeatedly engaged in a pattern of behavior designed to intimidate and threaten [his] co-workers and supervisors." (Joint Exhibit 56). The charges included various allegations of disruptive workplace behavior, including the making of the alleged threat. The charges informed plaintiff of his right to a hearing. After plaintiff did not respond to the charges by May 8, 1998, a union attorney sent him a letter with a copy of charges on May 11, 1998. Plaintiff claims he did not receive notice of the charges until May 16, 1998.

#### 3. *Medical records access request*

Plaintiff requested copies of his medical records. It is unclear if this request was in writing, but it was acknowledged as received on May 1, 1998, in a memo to Puglisi. (Joint Exhibit 37). Puglisi acknowledged receipt of the memo on June 2, 1998. The memo indicated that "anything less than a complete disclosure of the medical record constitutes a partial denial and the qualified person may request a review of this decision by the Medical Access Review Committee appointed by the Commissioner of Mental Health. The reason for any denial must be documented and submitted within three (3) days to respond to constraints for the request for

access." (emphasis omitted). The blank for expected response date was left blank. Under the sections of the medical records approved for access, Puglisi circled "history and physical" and "discharge summary." The space for explaining a denial was left blank. Puglisi's signature is dated June 2, 1998.

Plaintiff claims he received only part of his medical records. Plaintiff contacted an attorney, who wrote a letter to Benedictine on June 24, 1998, asking for the section of the law under which plaintiff was involuntarily admitted, and if the medical records sent to plaintiff constituted his entire record. (Joint Exhibit 33). Plaintiff's attorney enclosed the medical records plaintiff claims he received from Benedictine. A nurse from Benedictine responded by letter, dated July 1, 1998, informing plaintiff's attorney that Mental Hygiene Law § 9.39 was the authority under which plaintiff was admitted, and that the records plaintiff's attorney enclosed constituted only the part of his medical records authorized by Puglisi for release. (Joint Exhibit 34).

Plaintiff's attorney responded to this letter by a letter dated July 6, 1998. Plaintiff's attorney asked for a written copy of the notice of plaintiff's status and rights given to plaintiff while he was hospitalized, and for any proof of notice to mental hygiene legal services. Plaintiff's attorney also asked for the authority under which plaintiff was denied his entire medical record. In the event such authority was Mental Hygiene Law § 33.16(c), plaintiff's attorney asked for a copy of any notification of the denial of access to records provided to plaintiff. (Joint Exhibit 35). By letter dated August 4, 1998, Benedictine responded, enclosing a complete copy of plaintiff's medical records, and informing plaintiff's attorney that Puglisi granted the release. (Joint Exhibit 36).

The parties have briefed the issues fully in their memoranda of law.[2]

### DISCUSSION [3]

### I. SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate only when the pleadings, depositions, answers

2. Perhaps due to the number of issues and parties, the briefing in this case was quite extensive. To be sure, the parties' memoranda of law alone comprise approximately 283 pages, and over 100 joint exhibits have been submitted. Defendants have repeatedly expressed discontent with what they perceived to be plaintiff's violations of the local rules regarding the response to the statement of material facts and the length of plaintiff's response papers. Frustration, insofar as it pertains to dealing with the bickering among the parties, is shared, but it appears the defendants, too, may be guilty of some "artful" compliance with the page, margin, spacing, and compression limitations of Local Rule 10.1. *See* Docket No. 93, Defendants Smith and Puglisi Memorandum of Law in Support of Summary Judgment Motion (font); Docket No. 95, Defendants Benedictine Hospital, Steres, Ginsberg, McGregor Memorandum of Law in Support of Summary Judgment Motion (spacing); Docket No. 90, Ulster County

defendants Memorandum of Law in Support of Summary Judgment Motion (page). Nevertheless, in this particular case, in the interests of disposing of cases on their merits, the parties' motion practices will be ignored.

3. As an initial matter, defendants Smith and Puglisi submitted an extension of an order from a Commonwealth Court of Pennsylvania, purporting to stay "[a]ll court actions, ... pending against an insured of Legion [Insurance Company] in the Commonwealth of Pennsylvania or elsewhere" until December 1, 2002. Legion Insurance Company insures both Smith and Puglisi, and is currently in bankruptcy proceedings in Pennsylvania. There is no compelling reason, neither in law, *Baker by Thomas v. General Motors Corp.*, 522 U.S. 222, 236 n. 9, 118 S.Ct. 657, 139 L.Ed.2d 580 (1998) (citing *Donovan v. Dallas*, 377 U.S. 408, 84 S.Ct. 1579, 12 L.Ed.2d 409 (1964)) (The Supreme Court "has held it impermissible for a state court to enjoin a party

to interrogatories, admissions, and affidavits show that there is no genuine issue as to any material fact, and that the moving party is entitled to summary judgment as a matter of law. *See* Fed.R.Civ.P. 56; *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Richardson v. New York State Dep't of Correctional Serv.*, 180 F.3d 426, 436 (2d Cir.1999). The moving party carries the initial burden of demonstrating an absence of a genuine issue of material fact. *See* Fed.R.Civ.P. 56; *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Thompson v. Gjivoje*, 896 F.2d 716, 720 (2d Cir.1990). Facts, inferences therefrom, and ambiguities must be viewed in a light most favorable to the nonmovant. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Richardson*, 180 F.3d at 436; *Project Release v. Prevost*, 722 F.2d 960, 968 (2d Cir.1983).

Once the moving party has met the initial burden of demonstrating the absence of a genuine issue of material fact, the nonmoving party "must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56; *Liberty Lobby, Inc.*, 477 U.S. at 250, 106 S.Ct. 2505; *Celotex Corp.*, 477 U.S. at 323, 106 S.Ct. 2548. Courts have urged care in reviewing discrimination claims, noting that

"[b]ecause direct evidence of ... discriminatory intent will rarely be found, 'affidavits and depositions must carefully be scrutinized for circumstantial proof which, if believed, would show discrimination.'" *Schwapp v. Town of Avon*, 118 F.3d 106, 110 (2d Cir.1997) (quoting *Gallo v. Prudential Residential Servs.*, 22 F.3d 1219, 1224 (2d Cir.1994)). Nevertheless, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co.*, 475 U.S. at 586, 106 S.Ct. 1348; *see also Schwapp*, 118 F.3d at 110 ("[e]ven in the discrimination context, a plaintiff must provide more than conclusory allegations of discrimination to defeat a motion for summary judgment."). To withstand a summary judgment motion, sufficient evidence must exist upon which a reasonable jury could return a verdict for the nonmovant. *See Liberty Lobby, Inc.*, 477 U.S. at 248–49, 106 S.Ct. 2505; *Matsushita Elec. Indus. Co.*, 475 U.S. at 587, 106 S.Ct. 1348. Conversely, "summary judgment is appropriate only where application of the law to those undisputed facts will reasonably support only one ultimate conclusion." *Richardson*, 180 F.3d at 438.

## II. SECTION 1983 AND STATE CONSTITUTIONAL CLAIMS

Plaintiff, in his *first, third,* and *fourth* causes of action,[4] alleges violation of his

---

from proceeding in federal court"), nor in comity, to allow defendants to place upon this litigation an unneeded and unwanted tourniquet under the veil of a stay issued by a state court. *See Niemczyk v. Coleco Industries, Inc.*, 581 F.Supp. 717, 718 (N.D.N.Y.1984). As the court in *Niemczyk* stated, there is "no basis in law or logic for permitting the defendant to hide behind the cloak of a state court stay which expansively restricts lawsuits against third parties who ultimately are insured by a bankrupt corporation." *Id.* at 718. The named defendants, Smith and Puglisi, and not the insurance company, have an obligation to defend against this suit "irrespective

of whether its insurance carrier is legally or financially able to discharge its obligations to it." *Id.* Even if Legion is unable to reimburse Smith and Puglisi for any costs or liability, "the proper remedy available to [them] is an action for breach of contract. In any event the contractual relationship between [Smith and Puglisi] and [Legion] has no legal effect upon plaintiff's right to sue [Smith and Puglisi] in the first instance." *Id.*

4. All facts relevant to plaintiff's *sixth* cause of action are also relevant to the discussion of his *first, third,* and *fourth* causes of action in II(B), *infra*. *See also infra* note 12.

federal and state right to be free from false arrest and false imprisonment without due process of law.[5] Because these causes of action require the same proof, i.e., state action and deprivation of a right, they will be discussed together under the 42 U.S.C. § 1983 framework below.

42 U.S.C. § 1983 is the "basic vehicle" by which a federal court adjudges alleged state and local infringements of federally created rights. *Greene v. Hawes,* 913 F.Supp. 136, 141 (N.D.N.Y.1996). Section 1983 itself creates no substantive rights, but provides a "procedure of redress for the deprivation of rights established elsewhere." *Thomas v. Roach,* 165 F.3d 137, 142 (2d Cir.1999). In order to succeed on a cause of action under § 1983, a plaintiff must prove by a preponderance of the evidence that: 1) the defendant, in committing the complained of acts, was acting under color of state law; and 2) such conduct deprived the plaintiff of a right, privilege, or immunity guaranteed by the federal constitution or federal law. *Flagg Bros., Inc. v. Brooks,* 436 U.S. 149, 155, 98 S.Ct. 1729, 56 L.Ed.2d 185 (1978); *see also West v. Atkins,* 487 U.S. 42, 48, 108 S.Ct. 2250, 101 L.Ed.2d 40 (1988); *Pitchell v. Callan,* 13 F.3d 545, 547 (2d Cir.1994). A prerequisite to a defendant's § 1983 liability is personal involvement in the alleged deprivation. *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994).

## A. *Under Color of State Law*

One of the more contentiously debated issues in this case is whether defendants were acting "under color of state law."[6] "The traditional definition of acting under color of state law requires that the defendant in a § 1983 action have exercised power by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law." *West,* 487 U.S. at 49, 108 S.Ct. 2250 (citations omitted); *Kia P. v. McIntyre,* 235 F.3d 749, 755–56 (2d Cir.2000). Thus, the Supreme Court has recognized that a defendant employed by the state will typically be considered a state actor. *Lugar v. Edmondson Oil Co.,* 457 U.S. 922, 935 n. 18, 102 S.Ct. 2744, 73 L.Ed.2d 482 (1982). The Court also recognized, however, that even defendants who are not state employees can be deemed state actors. *Id.* at 937, 102 S.Ct. 2744 (stating, a person is said to be a state actor "because he is a state official, because he has acted together with or has obtained significant aid from state officials, *or* because his conduct is otherwise chargeable to the State") (emphasis added). In circumstances where a defendant is considered a state actor, and has thus acted under color of state law, his or her conduct is said to be "fairly attributable to the state." *Id.* at 937, 102 S.Ct. 2744.

As "[w]hat is fairly attributable is a matter of normative judgment, [with] the criteria lack[ing] rigid simplicity," *Brentwood,* 531 U.S. at 295, 121 S.Ct. 924, "[i]t is fair to say that 'our cases deciding when private action might be deemed that of the state have not been a model of consistency'." *Lebron v. National R.R. Passenger*

---

5. Even though plaintiff placed substantive and due process violations underneath a separate heading in his moving papers, all germane arguments he asserts in support thereof are repetitive of and applicable to the § 1983 analysis and will therefore be considered part of that analysis in this opinion.

6. The Supreme Court has made it clear that a defendant's conduct satisfying the "state action" requirement of a Fourteenth Amendment claim will also satisfy the "under color of state law" requirement of a § 1983 claim. *See, e.g., Brentwood Academy v. Tennessee Secondary School Athletic Assn.,* 531 U.S. 288, 295 n. 2, 121 S.Ct. 924, 148 L.Ed.2d 807 (2001).

Corp., 513 U.S. 374, 378, 115 S.Ct. 961, 130 L.Ed.2d 902 (1995) (quoting Edmonson v. Leesville Concrete Co., 500 U.S. 614, 632, 111 S.Ct. 2077, 114 L.Ed.2d 660 (1991) (O'CONNOR, dissenting)). Determining whether a private party's conduct is state or private action "frequently admits of no easy answer." Jackson v. Metropolitan Edison Co., 419 U.S. 345, 349–50, 95 S.Ct. 449, 42 L.Ed.2d 477 (1974). "Only by sifting facts and weighing circumstances can the nonobvious involvement of the State in private conduct be attributed its true significance." Burton v. Wilmington Parking Auth., 365 U.S. 715, 722, 81 S.Ct. 856, 6 L.Ed.2d 45 (1961).

Predictably, therefore, results have been inconsistent when determining whether the decision by private medical personnel and entities to involuntarily commit an individual is conduct amounting to state action. Courts outside of New York, confronted with other mental health legislation, have split on the issue, with some finding no state action and granting summary judgment to such private entities and hospitals,[7] and others finding state action or, when faced with factual discrepancies impeding determination of the issue as a matter of law, potential state action.[8] Further exacerbating the issue, there is a split of authority among courts interpreting the New York Mental Hygiene Law as to whether the decision to involuntarily commit pursuant to that statute is made under color of state law. See Okunieff v. Rosenberg, 996 F.Supp. 343 (S.D.N.Y.1998) (finding no state action as a matter of law). But see Rubenstein

v. Benedictine Hosp., 790 F.Supp. 396 (N.D.N.Y.1992) (finding state action as a matter of law); Ruffler v. Phelps Memorial Hosp., 453 F.Supp. 1062; Snyder v. Albany Medical Center Hosp., 206 A.D.2d 816, 615 N.Y.S.2d 139 (N.Y.App.Div.1994).

## 1. The public defendants

Plaintiff claims that Townsend and Beckman, along with DSS officials, were the catalysts behind the issuance and execution of the pick-up order and his subsequent confinement. DSS and DMH are governmental entities. Townsend and Beckman are both employees of Ulster County. Townsend is the commissioner of DMH and director of community services, and Beckman is the deputy director of DMH. There is sufficient factual support that all were involved in the process to pick up and involuntarily detain plaintiff, as more fully demonstrated below. Plaintiff alleges that Townsend and Beckman were involved in the process the entire time, conversing with DSS officials, maintaining continuous contact with Smith, and contacting the hospital. DSS officials were also arguably involved in the entire process of having plaintiff picked up and detained involuntarily. They conversed with DMH officials, tried to convince DSS employees to make their fears known, attempted to convey information to Benedictine about plaintiff with questionable motives, and were adamant about being kept apprised of any possible release. A jury could reasonably find that DSS and Townsend and Beckman, and therefore DMH,

---

7. See, e.g., Rockwell v. Cape Cod Hosp., 26 F.3d 254 (1st Cir.1994); Harvey v. Harvey, 949 F.2d 1127 (11th Cir.1992); Spencer v. Lee, 864 F.2d 1376 (7th Cir.1989); Trimble v. Androscoggin Valley Hosp., Inc., 847 F.Supp. 226 (D.N.H.1994); Lewis v. Law-Yone, 813 F.Supp. 1247 (N.D.Tex.1993); Janicsko v. Pellman, 774 F.Supp. 331 (M.D.Pa.1991).

8. See, e.g., Jensen v. Lane County, 222 F.3d 570 (9th Cir.2000); Davenport v. Saint Mary Hosp., 633 F.Supp. 1228 (E.D.Pa.1986) (finding potential state action); Brown v. Jensen, 572 F.Supp. 193, 197 n. 1 (D.Colo.1983); Cummings v. Charter Hosp. of Las Vegas, Inc., 111 Nev. 639, 896 P.2d 1137, 1144 (1995).

were active in plaintiff's pick-up and involuntary confinement.

### 2. The "private" defendants

■ Because "[c]haracterizing a private party as a 'state actor' is a fact-specific inquiry, . . . courts considering the issue typically look to such factors as the public function of the party's conduct, whether the private party acted under state compulsion, and whether the party's conduct was jointly undertaken with the state." *Logan v. Bennington College Corp.*, 72 F.3d 1017, 1027 (2d Cir.1995) (citing *Lugar*, 457 U.S. at 939, 102 S.Ct. 2744).[9] Sufficient factual discrepancies prevent a determination that the private defendants are or are not state actors as a matter of law. Thus, all motions for summary judgment on the issue, both by plaintiff and by all private defendants, must be denied.

### a. Close Nexus/state Compulsion

■ Private conduct is state action where there exists a "sufficiently close nexus between the State and the challenged action of the [private] entity so that the action of the latter may be fairly treated as that of the State itself." *Jackson*, 419 U.S. at 353, 95 S.Ct. 449. The close nexus is ordinarily present when it is proven that the state "has exercised coercive power [over a private decision] or has provided such significant encouragement, either overt or covert, that the choice in law must be deemed to be that of the state'." *Disabled in Action of Metropolitan New York v. Hammons*, 202 F.3d 110, 122 (2d Cir.2000) (quoting *Blum v. Yaretsky*, 457 U.S. 991, 1004, 102 S.Ct. 2777, 73 L.Ed.2d 534 (1982)). This standard has been described as the "fundamental" consideration when determining whether a private party's conduct is state action. *See Catanzano by Catanzano v. Dowling*, 60 F.3d 113, 118 (2d Cir.1995) (citing *San Francisco Arts & Athletics, Inc. v. United States Olympic Committee*, 483 U.S. 522, 546, 107 S.Ct. 2971, 97 L.Ed.2d 427 (1987)).

■ The fact that a private entity or individual is regulated by the state is insufficient, by itself, to convert the private action into state action. *American Manufacturers Mutual Ins. Co. v. Sullivan*, 526 U.S. 40, 52, 119 S.Ct. 977, 143 L.Ed.2d 130 (1999); *Desiderio v. National Ass'n. of Securities Dealers, Inc.*, 191 F.3d 198, 206 (2d Cir.1999). Similarly, if the state merely approves, or acquiesces in, the actions of private parties, the requisite nexus is absent. *Blum*, 457 U.S. at 1004, 102 S.Ct. 2777. "Although private use of state-sanctioned private remedies or procedures does not rise, by itself, to the level of state action, our cases have found state action when private parties make extensive use of state procedures with 'the overt, significant assistance of state officials'." *Edmonson*, 500 U.S. at 622, 111 S.Ct. 2077 (citations omitted).

Here, sufficient factual questions must be resolved before determining whether DSS and DMH compelled the private actors to take action. It could be inferred that Townsend and Beckman were work-

---

**9.** It is freely admitted that the "tests" which have been developed to analyze whether a private party is acting under color of state law often overlap, are combined or enumerated differently, or are given different labels, and different courts may draw on the same or similar principles of law when applying different tests to their respective facts. *See Island Online, Inc. v. Network Solutions, Inc.*, 119 F.Supp.2d 289, 305 (E.D.N.Y.2000) ("[t]he four tests are not absolutely orthogonal to one another, but among them, they thoroughly cover the jurisprudential territory"). Because the "state compulsion" test and the "close nexus" test both utilize principles of law applicable to this case, they will be discussed together, and the "public function" test will be discussed separately.

ing closely with DSS. They had conversations with employees of DSS regarding the incident, and a jury could find that Miller, since the alleged threat was directed at her, was instrumental with Townsend and Beckman in bringing about plaintiff's pick up and involuntary detention at Benedictine. In turn, it could be inferred that Smith was compelled to act by working closely with Townsend and Beckman, and Smith's compelled influence further compelled others in the decisionmaking chain. A reasonable factfinder may find that Smith went further than simply answering a "hypothetical" question as to what Townsend's "options" were with regard to a situation. It can be inferred that Smith was well aware of plaintiff's identity, of what the threat entailed, and of the government officials' wishes, expressed through Townsend.

Factual questions also exist as to whether Smith further exerted his influence over the situation. After talking with Townsend, he immediately called McGregor, telling her that Townsend "may" be requesting the issuance of a pick-up order. It can be inferred that Smith was not so much telling her that Townsend might request such an issuance, but instead that he was directing her to comply with such a request. There seems to be little other reason that Smith would call McGregor. She claims to be well-schooled in the law in this area, and there does not seem to be any indication, at least from her, that she is incompetent to field the phone call herself without the benefit of a "heads-up" from Smith.

Further, McGregor may have been directly compelled by Townsend. She took a phone call from Townsend. She was aware of Townsend's professional position. She argues that, because Townsend did inform her that plaintiff had bipolar disorder, was receiving treatment for it, took a recent leave because of mental health reasons, made specific threats against individuals, and had access to firearms, she made an independent medical judgment to issue the order. In her deposition, however, she claims that she asked numerous questions of Townsend as to whether such information was corroborated and Townsend answered in the negative. Townsend then proceeded to present his case to McGregor, and she succumbed only after this conversation and her later one with Smith, who could be found to be acting jointly with Townsend. Reasonable minds could find he did not simply inform her of the situation and let her decide; he argued for plaintiff's involuntary pick up and detention. It could be inferred the issuance of the order was heavily influenced by Townsend and, consequentially, Smith, Beckman and DSS. Smith's government influenced influence did not stop here. After her conversation with Townsend, McGregor called Smith back to further seek his advice on the issue. Smith's opinion, of course, could be found to be a foregone conclusion. It could be found that he persuaded McGregor, based on what the government officials wanted.

Benedictine contends that it is normal for McGregor and Townsend, and McGregor and Smith, to have these types of conversations. A jury could find, however, that these conversations went beyond normal protocol. It could be inferred that Townsend and Smith both had strongly held opinions about the matter, and that those opinions and the influence exerted spewed forth in the conversations with McGregor, so as to make the judgment exercised not entirely her own.

After the issuance of the pick-up order, Smith and the government employees' influence could be found to be present in the subsequent actions of McGregor, Steres, Ginsberg, and Puglisi. McGregor, already

burdened with the pressure by Smith and the government officials, conducted her examination of plaintiff upon his arrival in the emergency room at Benedictine. A jury could infer that her conclusion with respect to plaintiff, that he was a danger and was not safe to release, was simply another documentation of the beliefs held by those influencing her.

Ginsberg's involvement in the matter could also be found to be influenced by the government. Taking the facts in the light most favorable to plaintiff, the conversation between Ginsberg and Smith could be found to be a bit odd. There is no evidence that Smith personally sees through all involuntary admissions. According to him, his express purpose for calling Ginsberg was to ensure that plaintiff was medically cleared, a prerequisite to his involuntary admission and confinement. Smith claims that only after that conversation was he convinced that particular requirement was satisfied. The call could be found to be an attempt to further influence the process.

In turn, Steres' examination of plaintiff could be found to be influenced by Ginsberg's signature essentially agreeing with McGregor's alleged cursory examination, which could be found to be influenced by her conversations with Smith and Townsend. Steres' examination did not take long, and was not comprehensive. At the very least, factual questions remain as to whether he effectively "rubber stamped" the prior conclusions reached. Steres was aware that McGregor had issued the pick-up order. It is reasonable for him to believe that this pick-up order had origins in the governmental chain of command.

The actions of Puglisi certainly could be found to be influenced by Smith, who was influenced by Townsend, Beckman, and DSS. Taking the facts in the light most favorable to plaintiff, Puglisi, upon her initial examination, found no danger in plaintiff and informed him he would be discharged sometime that same day. She then told her team, in effect, the same thing. She, or some member of her team, then had a conversation with Smith. After this conversation, in which Smith expressed the reservations that governmental employees had about the possible consequences of plaintiff's release, her conclusion suddenly changed and the decision to detain plaintiff over the weekend was made. In fact, Puglisi indicated that the decision to so detain plaintiff was joint between her team and Smith. Smith's influence, and his relaying of governmental concerns about the issue, could be found to be state compulsion.

In sum, numerous factual discrepancies exist so as to preclude ruling as a matter of law whether state compulsion was present. All parties tell a different version of the events involved, but credibility determinations are not to be resolved at summary judgment. A reasonable jury could find that the DSS and DMH influence was felt every step of the process, and their concerns and arguments were considered and acted upon by the private defendants. There is certainly evidence Smith was involved throughout the decisionmaking process, and that his influence was felt by the private defendants. There is certainly evidence from which a reasonable factfinder could conclude that Townsend, acting on conversations and beliefs jointly held with Beckman and DSS, used his position in government to influence Smith's actions. McGregor could have felt ill-equipped to exercise her own judgment under the combined weight of Smith and the governmental employees' expressed views and opinions. Ginsberg and Steres may have felt this pressure as well, and there is ample evidence Puglisi did. Thus, though the issue of whether the private defendants

were state actors cannot be determined as a matter of law, sufficient factual discrepancies exist so as to send the matter to the jury. *See Palaimo v. Lutz,* 837 F.Supp. 55, 56 (N.D.N.Y.1993) ("until the facts are more fully known as to the State's role, if any, in the Hospital's alleged decision to confine Mrs. Palaimo against her will, the court will not dismiss Plaintiff's action against the Hospital at this time"). All summary judgment motions on this issue are denied.

### b. *Public function*

The conduct of private parties may also be deemed state action if such conduct is "traditionally the exclusive prerogative of the State." *Jackson,* 419 U.S. at 353, 95 S.Ct. 449; *D.L. Cromwell,* 279 F.3d at 161 (quoting *Blum,* 457 U.S. at 1004–05, 102 S.Ct. 2777). The running of elections, *Terry v. Adams,* 345 U.S. 461, 73 S.Ct. 809, 97 L.Ed. 1152 (1953), and of a town by a company, *Marsh v. Alabama,* 326 U.S. 501, 66 S.Ct. 276, 90 L.Ed. 265 (1946), and the provision of medical services to prison inmates, *West,* 487 U.S. 42, 108 S.Ct. 2250, have all been found to be functions exclusive to the state. *Island Online,* 119 F.Supp.2d at 305 (collecting above cases). "The fact '[t]hat a private entity performs a function which serves the public does not make its acts [governmental] action'." *San Francisco Arts & Athletics, Inc. v. U.S. Olympic Committee,* 483 U.S. 522, 544, 107 S.Ct. 2971, 97 L.Ed.2d 427 (1987) (quoting *Rendell–Baker v. Kohn,* 457 U.S. 830, 842, 102 S.Ct. 2764, 73 L.Ed.2d 418 (1982)).

Defendants cite with passion *Okunieff v. Rosenberg,* 996 F.Supp. 343 (S.D.N.Y. 1998), for the proposition that involuntary commitment, as a matter of law, is not a "public function." Plaintiff, on the other hand, argues the opposite, that involuntary commitment is a public function, and therefore state action, as a matter of law. It should be noted that, even if defendant's position were adopted, sufficient factual disputes, as noted immediately above this subpart, exist as to whether the private defendants' conduct can otherwise be considered state action. It is admitted that the following cases have some factual resemblance to the instant case, but, for the purposes of making the legal determination, in general, of whether involuntary commitment is a "public function," extensively laying out the facts of those cases is unnecessary. Suffice to say that the general issue confronted in those cases, whether involuntary commitment was a "public function," is identical to the one faced here.

Because *Okunieff* essentially rejects the reasoning and analysis in *Rubenstein v. Benedictine Hospital,* 790 F.Supp. 396 (N.D.N.Y.1992), a discussion of the latter must precede that of the former. In *Rubenstein,* the court focused not so much on the specific activity of involuntarily committing someone, but rather on the more general characterization of that activity, namely taking away an individual's liberty. The court noted, without much analysis, that "the power of depriving liberty is one reserved to the State, under either its *parens patriae* or police power." *Id.* at 406; *Accord Brown v. Jensen,* 572 F.Supp. 193, 197 n. 1 (D.Colo.1983) ("When physicians and hospitals confine persons pursuant to a mental health statute, they are exercising the power of detention delegated to them by the state. Because this power is one historically exercised by the government, the acts of the physicians and hospitals in this connection constitute state action").

Approximately six years later, *Okunieff* chastised the *Rubenstein* decision as improperly applying the public function test. 996 F.Supp. at 354–55. Initially, the court

noted that private physicians are not exercising governmental authority when using medical judgment in making a determination of whether a person is dangerous for the purposes of an involuntary commitment. *Id.* at 354. The courted noted that just because the state authorizes certain actions of physicians does not automatically translate into such actions becoming public functions, likening the involuntary commitment process to a physician authorized by the state to prescribe medication. *Id.*

In this regard, *Okunieff* is distinguishable. The instant case presents a situation where a reasonable jury could find that the governmental actors did not just license and authorize the private defendants to take the actions they did; they compelled it. As noted, a reasonable jury could relatedly find that no independent medical judgment was exercised by the private defendants; their judgment was compelled by the government. Thus, insofar as the *Okunieff* court's public function discussion was set in the landscape of its finding that no state compulsion existed, it is unpersuasive. *See Tewksbury v. Dowling,* 169 F.Supp.2d 103, 109 (E.D.N.Y.2001) (distinguishing *Okunieff* because the plaintiff presented sufficient evidence of state compulsion, not just an operating license granted to the hospital defendant by the state).

The court in *Okunieff,* however, did not stop there. It proceeded to its major point of disagreement with *Rubenstein*— that the court in *Rubenstein* improperly conducted the public function analysis by failing to focus on the doctrine's requirement that the function be one "exclusively" and "traditionally" by the state. 996 F.Supp. at 353–54 (citing *Rendell–Baker,* 457 U.S. at 832, 102 S.Ct. 2764 (citations omitted)). Explained the court, "[a] proper determination of whether an activity is

a public function involves delving into the history of the activity." *Id.* at 355. The court then "delved" into the "state-specific" inquiry of whether involuntary commitment has been traditionally and exclusively a public function in New York. *Id.* "[I]nvoluntary treatment and confinement of the mentally ill originated in private homes, and it later took place in both private and public institutes. Since the beginning of the United States, families, friends, and guardians have cared for the mentally ill privately." *Id.* (citing Henry M. Hurd et. al, 1 *The Institutional Care of the Insane in the United States and Canada* 40 (John Hopkins Press 1916)). The court continued, "[a]ccording to Blackstone, writing in 1765, '[o]n the first attack of lunacy, or other occasional insanity, while there may be hope of a speedy restitution of reason, it is usual to confine the unhappy objects in private custody under the discretion of the nearest friends and relations'." *Id.* (quoting 1 *Commentaries on the Laws of England* 305).

The court then noted that the first hospital to admit mentally ill persons was a private, not for profit hospital. *Id.* at 356. "In those days, 'commitment could be effected with the greatest of ease. No specific safeguard existed for the protection of the personal liberty of the supposedly mentally ill person. The pauper and indigent insane might be summarily committed to the poorhouse, prison or hospital by friends or relatives or by order of public officials'." *Id.* (quoting Albert Deutsch, *The Mentally Ill in America* 97–98 (2d ed.1949)). The court then went on to note that legislation dealing with the mentally ill in New York was sparse in the state's early days, "and if they were dependent, they were probably classed among the poor." *Id.* (citing Hurd, *supra* ). The first part of the nineteenth century saw New York's first "private asylums, county poorhouses, public asylums, and lunatic asy-

lums," followed a few years later by the first state-run institution. *Id.* "The earliest movement toward complete state care did not come until the second half of the nineteenth century." *Id.* The first law authorizing private entities to involuntarily commit individuals for a set period of time was passed in 1874. *Id.* (citing 1874 N.Y. Laws ch. 446, § 1). Thus, concluded the court, involuntary commitment is not a function "traditionally" and "exclusively" performed by the state.

The court then proceeded to reject the *Rubenstein* reliance on the state's *parens patriae* or police power, stating that just because a state may authorize commitment through these powers does not make the commitment process an "exclusive prerogative of the state." *Id.* The court stated "[t]he reasons for private commitment are practical. A person may need to be restrained immediately, by his or her family, physician, or even a stranger, and there may not be a public institution at hand. This is why the responsibility for treatment of the mentally ill is shared between private and public institutions." *Id.*

If this is indeed the proper way to apply the public function doctrine, the doctrine has little to no utility in the state actor context, an argument perhaps bolstered by the fact that an extraordinarily low number of "functions" have been held to be "public." The application, outlined in *Okunieff,* to this specific activity, involuntary commitment, is particularly troubling. First, our young country in the days to which *Okunieff* referred was without a comprehensive legislative scheme. Reliance upon the denizens within the borders to keep watch over family and friends was commonplace, especially since the government itself was likely concerning itself with weightier matters, such as escaping the hand of British rule. Even after, however, a fledgling nation needs time to establish its legislative initiatives, and time to develop official positions with which to dole out enforcement of those laws. Thus, the fact that private individuals had the power to involuntarily commit people stemmed not so much from grand foresight and legislative intention, but more so from necessity and lack of governmental resources.

No doubt informing this governmental apathy toward monopolizing the involuntary commitment process was the lack of knowledge about the mentally ill. The fact that psychology and psychiatry were not as advanced in the past as they are today is evident in the words and phrases chosen by the authorities cited by *Okunieff.* "[A]ttack of lunacy," "committed to the poorhouse," "classed among the poor," and "lunatic asylum" all demonstrate the primitive state of the study into the human mind. Thus, in addition to not being prepared to handle the processing of the mentally ill, the government probably found private citizens to be convenient receptacles into which it could dump the duty to care for the mentally ill.

The fact that, relative to today, the country was uneducated about mental health also bears relevance to the heinous ways in which the mentally ill were treated. Indeed, according to *Okunieff,* "[n]o specific safeguard existed for the protection of the personal liberty of the supposedly mentally ill person." 996 F.Supp. at 356. Accordingly, persons perceived to be mentally ill could be "summarily committed to the poorhouse, prison or hospital..." *Id.* The abuse resulting from this patently unfair scheme is without question what compelled the government, once its feet were under it and knowledge of mental health and current treatment techniques and conditions became public, to extensively legislate the area, and to ensure that procedural safeguards were in

place for those perceived to be mentally ill. Mental illness has been around since long before our country's humble beginnings. The mere fact that the government was not the first and only entity to involuntarily commit people or, in its infancy, did not immediately and completely take over the process, should not carry so much weight in the public function analysis. The fact that the government did not have such a stronghold on the process in the past, whether because it was unable, unwilling, or not educated enough to do so, seems to be a travesty and such past failure to take responsibility should not now be used as a shield against liability. Nonetheless, as the Supreme Court has mandated that the function be one "exclusively" and "traditionally" the prerogative of the state, it must be held that involuntarily commitment by private individuals is not a public function. Thus, as a matter of law, the private defendants were not performing a public function when they acted to involuntarily confine plaintiff. Because there are factual issues, however, as to whether the private defendants were compelled to act by the state, plaintiff's motion for summary judgment on the state actor issue remains denied.

### 3. Conspiracy to commit § 1983 violation

■■ Alternatively, even if the private defendants did not "act" under color of state law, plaintiff argues that they still incur liability for "conspiring" with state actors in violation of § 1983. A private party may be "transformed into a state actor by virtue of willful participation in joint action with the state or its agents." *Dennis v. Sparks*, 449 U.S. 24, 27, 101 S.Ct. 183, 66 L.Ed.2d 185 (1980). To succeed on a § 1983 action rooted in conspiracy, a plaintiff must prove an agreement between at least one state actor and at least one private party to act in concert to violate constitutional rights, and an overt act done in furtherance of the goals causing damages. *Ciambriello v. County of Nassau*, 292 F.3d 307, 324–25 (2d Cir. 2002). "Accusations of conspiracy are, unfortunately, easily made yet highly disruptive." *McArthur v. Bell*, 788 F.Supp. 706, 711 (E.D.N.Y.1992) (citing *Angola v. Civiletti*, 666 F.2d 1, 4 (2d Cir.1981)). Thus, "[c]onclusory, vague, or general allegations that the defendants have engaged in a conspiracy to deprive [a plaintiff] of his constitutional rights" are insufficient as a matter of law to support a claim under § 1983." *Ostrer v. Aronwald*, 567 F.2d 551, 553 (2d Cir.1977). Here, as demonstrated above, the actions of the defendants, as a whole and individually, raise factual questions as to whether the private defendants conspired with the state employees in violation of § 1983.

### B. Deprivation of Right

As stated above, in addition to proving defendants acted under color of state law, plaintiff must also prove that such action deprived him of a federally created right in order to succeed on his § 1983 claims, or of a right created by New York in violation of the state law. It has long been held that involuntary civil commitment is a "massive curtailment of liberty" requiring due process protection. *Vitek v. Jones*, 445 U.S. 480, 491, 100 S.Ct. 1254, 63 L.Ed.2d 552 (1980); *see also Addington v. Texas*, 441 U.S. 418, 425, 99 S.Ct. 1804, 60 L.Ed.2d 323 (1979); *O'Connor v. Donaldson*, 422 U.S. 563, 580, 95 S.Ct. 2486, 45 L.Ed.2d 396 (1975). While New York's overall statutory involuntary commitment scheme, on its face, passes constitutional due process muster, *Rodriguez v. City of New York*, 72 F.3d 1051, 1062 (2d Cir. 1995), an erroneous commitment pursuant to that scheme violates an individual's lib-

erty interest. *See Goetz v. Crosson*, 967 F.2d 29, 33 (2d Cir.1992).

■ In order for plaintiff's false arrest/imprisonment claims to survive the summary judgment stage, it must be demonstrated that there exists a material factual dispute as to whether there was an intent to confine, whether plaintiff was conscious of the confinement, whether plaintiff consented to the confinement, and whether or not the confinement was privileged.[10] *Rubenstein*, 790 F.Supp. at 409 (citations omitted). With respect to the pick-up of plaintiff, the parties are in disagreement as to whether there was a proper "reporter" under Mental Hygiene Law § 9.45 and as to whether the facts indicated that there was probable cause to issue the pick-up order under same section. With respect to the admission and confinement of plaintiff, the parties are in disagreement as to whether the statutory requirements for admission were present under Mental Hygiene Law § 9.39, as to whether plaintiff was given proper notice of his rights pursuant to that same section, and as to whether plaintiff, in any event, consented to his admission and treatment.

**1.** *Propriety of the pick-up order*

**a.** *Proper reporter under Mental Hygiene Law § 9.45*

■ Section 9.45, the section under which plaintiff was picked up, provides that "[t]he director of community services or the director's designee shall have the power to direct the removal of any person, within his or her jurisdiction, to a hospital . . . , if the parent, adult, sibling, spouse or child of the person, the committee of the person, a licensed psychologist, registered professional nurse or certified social worker currently responsible for providing treatment services to the person, a licensed physician, health officer, peace officer or police officer reports to him that such person has a mental illness for which immediate care and treatment in a hospital is appropriate and which is likely to result in serious harm to himself or herself or others."

Defendants argue that Townsend is a proper reporter under this section. According to the pick-up order, the information providing the basis for the pick-up order came from Townsend, who was identified as a "certified social worker currently responsible for providing treatment services to the person." (Joint Exhibit 2). In the alternative, defendants argue that Townsend is a "health officer" or that, pursuant to the powers granted to him by § 9.47, to wit, that he is responsible for seeing that those in need of treatment get such treatment, he is otherwise a proper reporter.

These arguments are highly suspect. Plaintiff's argument that the statute is designed so that only persons intimately knowledgeable about a particular person's mental condition are intended to be reporters has some merit. Family members and a committee of the person are both groups of people likely to have firsthand knowledge of a mentally ill person's condition. In addition, licensed physicians, health officers, police officers, and peace officers would be in positions to recognize dangerousness among individuals. For example, police officers and peace officers are in a position to see that mentally ill persons on the street are in need of treatment lest

---

**10.** "The elements of a false arrest claim under § 1983 are 'substantially the same' as the elements of a false arrest claim under New York law," *Hygh v. Jacobs*, 961 F.2d 359, 366 (2d Cir.1992), and "[b]ecause false arrest is a type of false imprisonment, the two claims have identical elements." *Kinzer v. Harris*, 146 F.Supp.2d 194, 199 n. 9 (N.D.N.Y.2001) (citing *Singer v. Fulton County Sheriff*, 63 F.3d 110, 118 (2d Cir.1995)).

they injure themselves or others. Likewise, doctors, through examination of their patients, are likely to be able to competently detect whether someone is a danger to himself or others. Registered nurses or certified social workers currently providing treatment for a person are also in a position to see, on a firsthand basis, whether someone is a danger to himself or others.

It would be nonsensical, for example, for a doctor who has had no contact whatsoever with a person to have the authority to have that person locked up. The statute is likely designed to eliminate actions taken largely on weak evidence by groups of people unfamiliar with the particular characteristics of a specific person. This is reinforced through the requirement that the group of persons not just name an individual, but also report that such person "has a mental illness for which immediate care and treatment in a hospital is appropriate and which is likely to result in serious harm to himself or herself or others."

Townsend is without question a "certified social worker," and he also is, in the general sense of the word, a "health officer." The latter could perhaps even be inferred from the general responsibility given to him by § 9.47. Nevertheless, under either label, there is no question that Townsend was not in any way specifically familiar with plaintiff. There is no question he did not provide any treatment services to plaintiff. There is no indication he even knew who plaintiff was prior to the events that triggered this litigation. Townsend was not a proper reporter under § 9.45.

In addition, another problem would arise if Townsend were considered a proper reporter under the statute. The § 9.45 pick-up form allows such pick-up to be initiated by either the director of community services or his designee. Thus, Townsend has the authority himself to initiate the pick-up order process on proper information, though defendants have repeatedly argued that he did not issue the pick-up order. If Townsend is considered a proper reporter, he could effectively initiate those pick-up orders, as "director of community services," on information provided by himself, as a "health officer" or through any powers granted to him under § 9.47. This surely is not the intent of the legislature, to have one person essentially deciding every involuntary pick-up.

Deciding the consequences of the pick-up order error, however, is premature at this stage because of the qualified immunity defense raised by McGregor and Townsend, discussed below. If the jury finds that the defendants' actions were objectively reasonable, it may also find that Townsend informing her of his belief that treatment was provided to plaintiff by DMH, and her believing this and indicating that belief on the pick-up order, were objectively reasonable actions and exempt Townsend and McGregor from liability.

### b. *Probable cause to arrest under Mental Hygiene Law § 9.45*

█ "The existence of probable cause to arrest constitutes justification and 'is a complete defense to an action for false arrest'." *Weyant v. Okst*, 101 F.3d 845, 852 (2d Cir.1996) (quoting *Bernard v. United States*, 25 F.3d 98, 102 (2d Cir. 1994)). The issue of probable cause may be decided as a matter of law if there is no dispute as to the relevant events and beliefs of those involved. *Weyant*, 101 F.3d at 852, but where the question of whether the person arresting, or in this case, the persons directing the arrest, had probable cause is "predominantly factual in nature," [it is] properly present[able] to the jury." *Moore v. Comesanas*, 32 F.3d 670, 673 (2d Cir.1994) (citations omitted).

█ As noted above, Mental Hygiene Law § 9.45 mandates that a seizure can be

made only on probable cause that a person "has a mental illness for which immediate care and treatment in a hospital is appropriate and which is likely to result in serious harm to himself or herself or others." The parties have very different versions of whether the information obtained at the point of the issuance of the pick-up order was sufficient to satisfy the statute. Defendants argue that it was clear that a serious threat had been made, that DSS personnel were frightened because of it, and that additional information, like plaintiff's mental illness history and his access to firearms, was also known. This knowledge, argues the defendants, is a proper basis for issuing the pick-up order. Plaintiff, on the other hand, argues that the only information known to defendants about the threat was uncorroborated and incorrect, and that insufficient investigation was done to corroborate the threat. He argues that the parties acted jointly and without the attention that was due to the matter. He argues that even if the order was issued out of the axiom that it is better to be safe than sorry, such is not the standard of § 9.45.

A detailed description of the factual discrepancies need not be restated here. All disputes are adequately outlined in the extensive factual background and discussed up to this point. Suffice it to say that several jury questions exist as to the actions taken and facts known to the defendants prior to the issuance of the pick-up order. Probable cause cannot be determined as a matter of law on this record.

2. *Propriety of involuntary admission and confinement*

a. *Compliance with substantive admission/confinement requirements of Mental Hygiene Law § 9.39*

Section 9.39 provides for the involuntary commitment of an individual "alleged to have a mental illness for which immediate observation, care, and treatment in the hospital is appropriate," upon a finding that such mental illness "is likely to result in serious harm" to the individual or others. Mental Hygiene Law § 9.39. "Likely to result in serious harm" is defined, inter alia, as embodying "a substantial risk of physical harm to other persons as manifested by homicidal or other violent behavior by which others are placed in reasonable fear or serious physical harm". Mental Hygiene Law § 9.01. Thus, though not expressly stated, some showing of dangerousness is required to utilize § 9.39. *See Rodriguez*, 72 F.3d at 1061 ("Assuming that th[e] term ['mental illness'] can be given a reasonably precise content and that the 'mentally ill' can be identified with reasonable accuracy, there is still no constitutional basis for confining such persons involuntarily if they are dangerous to no one and can live safely in freedom") (quoting *O'Connor*, 422 U.S. at 575, 95 S.Ct. 2486); *see also Zinermon v. Burch*, 494 U.S. 113, 133–34, 110 S.Ct. 975, 108 L.Ed.2d 100 (1990) ("The involuntary placement process serves to guard against the confinement of a person who, though mentally ill, is harmless and can live safely outside an institution").

This showing of dangerousness under the statute does not necessarily require an overt act, but "which indicia of dangerousness satisfies the statute is guided by the medical principles generally accepted in the community..." *Id.* at 1062–63; *see also West*, 487 U.S. at 52 n. 10, 108 S.Ct. 2250 ("[I]t may be relevant that the challenged activity turned on judgments controlled by professional standards, where those standards are not established by the State"). Thus, contrary to plaintiff's contentions, the medical standards and whether the defendant physicians acted in accor-

dance thereto are indeed relevant here. What comprises those medical standards, however, and whether such standards were abided by, are questions of fact to be decided by the jury. *Rodriguez*, 72 F.3d at 1063.

Defendants argue that the private physician defendants made independent findings in accordance with the statute. This alone, however, even if true, is not enough. *Id.* (rejecting the suggestion that "a physician's mere making of a finding satisfies the requirements of either the statute or due process"). Instead, the findings must be made in accordance with the generally accepted medical standards of the community. Even if the parties' experts are in agreement as to what the proper medical principles guiding the § 9.39 determination are, which is certainly not admitted, there are clearly disputes as to whether such standards have been fulfilled. There are questions of fact as to whether McGregor, Steres and Puglisi conducted proper examinations, as to whether these examinations included physical as well as mental examinations, as to whether anything exhibited by plaintiff amounted to a finding of dangerousness, and as to whether such dangerousness was of such a substantial degree that plaintiff could not be released.[11]

McGregor and Steres conducted examinations that lasted about fifteen minutes each. Ginsberg claims that his normal examination in such a situation takes anywhere from fifteen minutes to an hour and entails both a physical and mental examination. It is entirely arguable here that no proper mental examination was conducted. The shortness of time and "coincidental" identical findings of all the private

defendants suggest that independent conclusions may not have been reached. In addition, a jury could find that Puglisi was the only private defendant who did conduct a mental examination of plaintiff, and that her examination initially resulted in a belief that plaintiff should be released, only to be changed later by a phone conversation between Smith and a member of her team.

Additionally, serious factual disputes are present as to the efforts taken to corroborate the alleged threat attributed to plaintiff. The private defendants claim they attempted to so corroborate, but a jury could certainly find an absence of support for this in the record. Further, the jury needs to determine the content and propriety of government officials' conversations with Smith and/or other members at Benedictine who were responsible for deciding whether plaintiff would remain confined. In short, just as the events leading up to the issuance of pick-up order are in serious dispute, so, too, are the events after plaintiff's arrival at Benedictine. These are factual inquires, and are inappropriate for resolution at the summary judgment stage. All motions for summary judgment on this issue are thus denied.

### b. *Compliance with notice requirements of Mental Hygiene Law*

Plaintiff also asserts he was not given proper notice of his legal status and rights pursuant to § 9.39. Section 9.39 provides that a person, at the time they are admitted involuntarily, must be given "written notice of his status and rights as a patient under this section." In addition, § 9.07

---

11. This is not the first time such allegations have been lodged against Benedictine. In *Rubenstein*, the court noted that, in the complaint, it was alleged that Benedictine and its private physicians "routinely and systematically involuntarily admit people who are not at the time of admission posing a substantial risk of danger to themselves or others," and that such practices "result in widespread denial of liberty without meeting the statutory requirements and without the required due process of law." 790 F.Supp. at 399.

mandates that the hospital "post copies of a notice, ..., at places throughout the hospital where such notice will be conspicuous and visible to all patients, stating the following: 1) the availability of the mental hygiene legal service; 2) a general statement of the rights of patients under the various admission or retention provisions of this article; and 3) the right of the patient to communicate with the director, the board of visitors, the commissioner of mental health, and the mental hygiene legal service."

It is unclear from the record whether or not plaintiff was given a written copy of his rights, as required by § 9.39. Benedictine argues that McGregor did not have the power to "admit" plaintiff, that he was thus not "admitted" when she examined him, and that he was given his status and rights by a psychiatric nurse at 7:30 p.m. when he was admitted. Benedictine also claims that plaintiff received paperwork regarding those rights that he did not retain, and that he saw a poster on a wall detailing his rights. Benedictine also claims plaintiff, on March 27, had a meeting set up with the mental hygiene legal service for March 30. In addition, argues Benedictine, it was McGregor's "usual practice" to inform persons about the services available to them through the mental hygiene legal services, and that, in any event, "a copy of the status and rights notice is posted on the wall of the psychiatric ER in plain view." (Docket No. 87, Benedictine Memorandum of Law in Opposition to Plaintiff's Motion for Partial Summary Judgment, p. 16). In sum, Benedictine argues that plaintiff was aware of his rights. Plaintiff, on the other hand, argues that he was not given written notice of his status and rights.

It should first be stated that the posting of a notice of rights and status is irrelevant to this inquiry. Such posting brings Bene-

dictine in compliance with § 9.09, but has no bearing on whether its duties to give written notice were discharged under § 9.39. The argument is wisely not advanced, nor would it be well taken even if advanced, that the posting of the notice gives plaintiff the "written notice" required by § 9.39. It seems clear that the written notice requirement of § 9.39 is above and beyond the general posting requirement of § 9.09. Thus, the fact that Benedictine may have had postings of rights and status at every turn in the hospital is of no aid. Written notice is also required.

Factual questions exist as to when, precisely, plaintiff was "admitted" to Benedictine. Benedictine seems to argue that admission occurred at 7:30, and that at time plaintiff was given proper notice of his rights. Plaintiff claims he was admitted at 6:30, and that no proper notice was given. Thus, a threshold question that needs to be determined is when plaintiff was actually admitted.

Even if plaintiff was "admitted" at 6:30 p.m. when Ginsberg signed the § 9.39 admission form, a factual question still remains. If this is true, then the hospital must, under the law and under its own regulations, give plaintiff written notice of his status, rights, and access to legal services. No one is arguing that Ginsberg gave him such notice. Thus, McGregor must have given him the written notice shortly thereafter in order to have even a colorable claim of statutory compliance. She completed the mental health evaluation at 6:50 p.m., the same time plaintiff signed a consent form, which, among other things, stated that he was aware of and understood his rights. As will be demonstrated under the subpart following this one, it seems doubtful that his signing of this consent form holds any weight. Regardless, it is not a signed consent form that the statute requires; it is written

notice of status and rights. Even if it might be McGregor's usual practice to verbally inform patients of their rights, written notice is required. If McGregor, or anyone else for that matter, did not give plaintiff such notice in between 6:30 and 6:50, assuming that this time gap is sufficient to constitute "upon admission," then the statutory mandates were violated.

If, as defendants claim, plaintiff was "admitted" at 7:30, a factual question is also presented as to whether plaintiff got written notice at that time. According to defendants, he did and he lost it. According to plaintiff, notice at this time was oral, and that he did not lose anything. The jury needs to decide when plaintiff was actually "admitted," and whether he was given written notice upon such admission. If the jury decides he was not given written notice, it is up to them to determine whether plaintiff was damaged by the statutory violation.

#### c. *Consent to confinement*

Defendants also argue that the false arrest/imprisonment claim must fail because plaintiff signed a form consenting to admission and treatment. Initially, it should be noted that there may be a timeline problem with this argument. A jury could find that plaintiff had already been admitted by the time he signed the consent form at 6:50 p.m. If he were, his consent to such admission and treatment would be irrelevant. He was already being evaluated by that point, and Smith had already prescribed medication for plaintiff and had already given the secure psychiatric ward instructions regarding plaintiff's admission and treatment. Thus, depending on the jury's finding as to the time of many alleged events, plaintiff's signing of the consent form may have been irrelevant.

Regardless of the jury's findings, however, the signing of such a consent form in this situation is still patently irrelevant. Using that allegation, that plaintiff signed the consent form, forces defendants into making a circular argument permeated with logical errors. It is difficult to see how "consent" has any place in the "involuntary" admission context. Defendants are not asserting that plaintiff was voluntarily admitted pursuant to the statutory sections of the Mental Hygiene Law providing for that type of admission. Yet, to argue that plaintiff's consent has relevance to the claims herein necessarily implies that admission and treatment were voluntary, not involuntary.

Further logical problems arise when the allegation of consent is paired with the mental condition that defendants are arguing plagued the plaintiff so much that it was necessary to arrest and involuntarily confine him. Defendants latch onto the allegation that plaintiff consented to admission and treatment, but they also argue that all statutory requirements for involuntary admission were satisfied. Among those requirements is a proper finding that plaintiff has a "mental illness" which makes him immediately dangerous. As such, defendants are arguing that a mentally ill person gave an informed, voluntary, and intelligent consent while simultaneously contending, in effect, that plaintiff was not of sound mind and was unreasonably dangerous so as to warrant involuntary admission and treatment. Under any standard of informed consent a mentally ill person's capacity to consent, by definition, is questionable. *See Zinermon*, 494 U.S. at 133, 110 S.Ct. 975 ("Indeed, the very nature of mental illness makes it foreseeable that a person needing mental health care will be unable... to make a knowing and willful decision whether to consent to admission"). Thus, even had plaintiff signed consent forms to treatment, such

signing has no relevance to the issues here.

Thus, as factual issues remain for the jury's determination on plaintiff's *first, third,* and *fourth* causes of action, summary judgment is inappropriate, and all motions on those causes of action are denied.[12]

### C. *Qualified immunity*

 Defendants Townsend, Beckman, McGregor, Steres, Ginsberg, Smith, and Puglisi all allege that, regardless of the court's determination on the "state actor" issue, they are entitled to qualified immunity from liability. When facing a defense of qualified immunity at the summary judgment stage, "a court should ask whether, viewing the evidence in the light most favorable to the non-moving party, the conduct that may be proved at trial is conduct that, at the time it occurred, violated a clearly established constitutional or statutory right." *Mozzochi v. Borden,* 959 F.2d 1174, 1178 (2d Cir.1992). Thus, where plaintiff has a clearly established constitutional or statutory right, the only remaining inquiry is 'whether the defendant's conduct is objectively reasonable. *See Anderson v. Creighton,* 483 U.S. 635, 639, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987). "Though mistaken judgments reasonably arrived at are protected, qualified immunity does not protect an official against redress for performance that was plainly incompetent." *Rodriguez,* 72 F.3d at 1065 (citing *Hunter v. Bryant,* 502 U.S. 224, 229, 112 S.Ct. 534, 116 L.Ed.2d 589 (1991)).

The right to be free from false imprisonment and false arrest is clearly established. *Robison v. Via,* 821 F.2d 913, 921 (2d Cir.1987); *Bordeaux v. Lynch,* 958 F.Supp. 77, 87 (N.D.N.Y.1997). Thus, if defendants' conduct was objectively reasonable, they are protected by qualified immunity. "While there may be times where the facts are not in material dispute, so as to permit the court to decide [the qualified immunity] issue as a matter of law, this is not such a case." *Id.* Plaintiff has presented evidence that would call into serious question the reasonableness of defendants' conduct. He claims all defendants essentially engaged in a conspiracy to unlawfully arrest and confine him, complete with inadequate examinations, noncorroboration of allegations, and inexcusable rubber stamping of others' baseless conclusions. If all this is taken as true, as is required for defendants' summary judgment motions, defendants' conduct could be found by a jury to be plainly incompetent. Likewise, if all of defendants' allegations are taken as true, as is required when disposing of plaintiff's motion, their conduct could be found by a jury to be objectively reasonable. Therefore, the matter is for the jury to decide at trial, and all summary judgment motions on the qualified immunity issue are denied.

### III. *DISABILITY DISCRIMINATION CLAIMS*

#### A. *ADA Claim*

In plaintiff's *second* cause of action, he alleges DSS constructively discharged him in violation of the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.* The statute provides that "[n]o covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to . . .

---

**12.** Plaintiff, in his *sixth* cause of action, claims that Benedictine, McGregor, Steres, Ginsberg, Smith and Puglisi, breached a duty of care owed to plaintiff in failing to properly comply with the mandates of New York law regarding arrest and confinement. As demonstrated, because factual questions clearly exist regarding whether defendants did comply with the statutory requirements, summary judgment on this claim is denied.

discharge of employees..." 42 U.S.C. § 12112(a); *Giordano v. City of New York*, 274 F.3d 740, 747 (2d Cir.2001). Disability discrimination claims brought pursuant to the ADA are analyzed under the burden-shifting framework set out in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973) and its progeny. *See Regional Economic Community Action Program, Inc. v. City of Middletown*, 294 F.3d 35, 48–49 (2d Cir. 2002). Under such framework, the plaintiff bears the initial burden of proving a *prima facie* case of discrimination.[13] *McDonnell Douglas*, 411 U.S. at 802, 93 S.Ct. 1817; *Parker v. Columbia Pictures Industries*, 204 F.3d 326, 332 (2d Cir.2000).

In order to establish his *prima facie* case, plaintiff must demonstrate that: 1) DSS is an employer subject to the ADA; 2) he was disabled within the meaning of the ADA; 3) he was otherwise qualified to perform the essential functions of his job at DSS, with or without reasonable accommodation; and 4) he suffered an adverse employment action (i.e., was discriminated against) because of his disability. *Heyman v. Queens Village Committee for Mental Health for Jamaica Community Adolescent Program, Inc.*, 198 F.3d 68, 72 (2d Cir.1999). "[P]laintiff cannot meet this burden through reliance on unsupported assertions," but instead "must come forward with evidence that would be sufficient to support a jury verdict in his favor." *Goenaga v. March of Dimes Birth Defects Foundation*, 51 F.3d 14, 18 (2d

Cir.1995). Because plaintiff cannot, as a matter of law, establish that his disorder qualifies as a disability under the ADA, the second, third, and fourth elements of the *prima facie* case will not be discussed.

As noted, as part of his *prima facie* case, plaintiff must demonstrate he had a disability. "Disability" is defined under the ADA as "(A) physical or mental impairment that substantially limits one or more of the major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment." 42 U.S.C. § 12102(2). "There is little doubt that bipolar disorder constitutes an impairment," *Horwitz v. L. & J.G. Stickley, Inc.*, 122 F.Supp.2d 350, 353 (N.D.N.Y. 2000); *see also Guice–Mills v. Derwinski*, 967 F.2d 794, 797 (2d Cir.1992) (depression is "impairment" under Rehabilitation Act), but where a plaintiff, like the one here, indicates that the disorder does not substantially limit his major life activity of working, it does not reach the level of "disability" under subsection (A) of the ADA disability definition. *See Kramer v. Hickey–Freeman, Inc.*, 142 F.Supp.2d 555, 559 (S.D.N.Y.2001) (where treatment is available, so as to prevent bipolar disorder from substantially limiting a major life activity, and the plaintiff announces an intention to return to work, the disorder cannot be said to substantially limit a major life activity). Plaintiff instead permissibly argues [14] that DSS regarded him

---

13. The remainder of the *McDonnell Douglas* framework is irrelevant to the ADA claim, as plaintiff cannot establish his *prima facie* case. The remainder of the framework is relevant, however, to plaintiff's disability discrimination claim under state law, and it will be discussed more fully therein. *See infra* Part III(B).

14. Contrary to the contention of DSS, the fact that plaintiff, in his complaint, did not allege that he was proceeding under subsection (C)

does not mean he cannot do so now. In fact, plaintiff did not allege that he was proceeding under any of the three subsections. Nevertheless, by alleging that he was a "qualified individual with a disability," which effectively encompasses all three subsections, plaintiff effectively put DSS on notice that any of the three subsections could be used. *See Greicus v. Liz Claiborne, Inc.*, No. 00–CV–9518, available at 2002 WL 244598, at *3 (S.D.N.Y. Feb.20, 2002).

as having a disability under subsection (C) of the disability definition. *See Treglia v. Town of Manlius,* 68 F.Supp.2d 153, 157 (N.D.N.Y.1999) (where plaintiff suffers from condition qualifying as an impairment under ADA, but nevertheless maintains it is controlled with medication and does not substantially limit MLA, the only avenue remaining open is under subsection (C)); *see also Sutton v. United Air Lines, Inc.,* 527 U.S. 471, 489, 119 S.Ct. 2139, 144 L.Ed.2d 450 (1999) ("Our conclusion that petitioners have failed to state a claim under subsection (A) of the disability definition does not end our inquiry. Under subsection (C), individuals who are 'regarded as' having a disability are disabled within the meaning of the ADA").

■ "[W]hether an individual is 'regarded as' having a disability 'turns on the employer's perception of the employee' and is therefore 'a question of intent, not whether the employee has a disability'." *Colwell v. Suffolk County Police Dep't.,* 158 F.3d 635, 646 (2d Cir.1998) (quoting *Francis v. City of Meriden,* 129 F.3d 281, 284 (2d Cir.1997)). According to the Supreme Court, "[t]here are two apparent ways in which individuals may fall within this statutory definition: (1) a covered entity mistakenly believes that a person has a physical impairment that substantially limits one or more major life activities, or

(2) a covered entity mistakenly believes that an actual, nonlimiting impairment substantially limits one or more major life activities.[15] In both cases, it is necessary that a covered entity entertain misperceptions about the individual—it must believe either that one has a substantially limiting impairment that one does not have or that one has a substantially limiting impairment when, in fact, the impairment is not so limiting." *Sutton,* 527 U.S. at 489, 119 S.Ct. 2139.

■ As this language makes clear, it is insufficient for an employer to regard the plaintiff as merely disabled or suffering from an impairment. *Colwell,* 158 F.3d at 646; *Hewitt v. Alcan Aluminum Corp.,* 185 F.Supp.2d 183, 187 (N.D.N.Y.2001) ("the mere fact that an employer is aware of an employee's impairment is insufficient to demonstrate either that the employer regarded the employee as disabled or that perception caused the adverse employment action"). Instead, it must regard the plaintiff as disabled within the meaning of the ADA. *Id.; see also Giordano,* 274 F.3d at 747; *Ryan v. Grae & Rybicki, P.C.,* 135 F.3d 867, 872 (2d Cir.1998); *Francis,* 129 F.3d at 284. Thus, the definition of disability under subsection (A), requiring proof that an impairment substantially limits a major life activity, has relevance under subsection (C) as well. *Ryan,* 135 F.3d at 872; *DeMar v. Car–Freshner*

**15.** The EEOC, charged with administering the ADA, has set forth not two but three different ways for a plaintiff to establish than an employer has regarded him as having a disability under the ADA. Specifically, a person is regarded as having a disability if he: 1) has a physical or mental impairment that does not substantially limit a major life activity but the employer treats the impairment as substantially limiting; 2) has an impairment that substantially limits a major life activity only because of the attitudes of others toward such an impairment; or 3) has none of the impairments defined [by the EEOC regulations] but

is treated by the employer as having one that substantially limits a major life activity. 29 C.F.R. §§ 1630.2(*l*)(1)-(3). Though the Second Circuit affords great deference to EEOC interpretations, *see, e.g., Francis,* 129 F.3d at 283 n. 1, the Supreme Court has recently rejected an interpretive guideline dealing with the ADA. *Sutton,* 527 U.S. at 482, 119 S.Ct. 2139 (rejecting position that persons are evaluated in their hypothetical uncorrected state for purposes of determining whether a person's condition substantially limits a major life activity).

*Corp.*, 49 F.Supp.2d 84, 94 (N.D.N.Y.1999) ("the focus is whether Defendant knew of Plaintiff's condition, and, if so, whether it believed that it substantially affected his ability in a major life activity").

Plaintiff must thus demonstrate that DSS perceived his bipolar disorder as substantially limiting his major life activity of work.[16] The inability to perform a single, specific job is insufficient to demonstrate that the major life activity of working has been substantially limited. *Muller v. Costello*, 187 F.3d 298, 313 (2d Cir.1999). Rather, a plaintiff must show that the employer believed he could not work in a "broad class of jobs." *Sutton*, 527 U.S. at 491–92, 119 S.Ct. 2139. Because a plaintiff cannot just rely on "speculation" or conjecture" to defeat a summary judgment motion, he is implored to adduce qualifications from other jobs to support the argument that the employer perceived him unable to work in the broad class of jobs. *Giordano*, 274 F.3d at 749–50. The perception that the plaintiff is substantially limited must also be shown to be present at the time of the alleged discrimination, "not potentially or hypothetically," *Sutton*, 527 U.S. at 482, 119 S.Ct. 2139, and such perception cannot be that the substantial limitation is temporary. *Adams v. Citizens Advice Bureau*, 187 F.3d 315, 316–17 (2d Cir.1999) (temporary impairment of ability to work is not "substantially limiting").

Plaintiff has wisely avoided asserting that DSS regarded him as having a disability within the meaning of the ADA because it ordered him to take a mental health exam,[17] or because it allowed him to take leave for mental health purposes.[18] Plaintiff has instead relied upon one alleged statement of one DSS employee, and DSS' actions in allegedly having plaintiff arrested and committed to support the notion that DSS perceived him to be disabled within the meaning of the ADA. This is insufficient.

■ It is not really in dispute that DSS knew of plaintiff's condition, but plaintiff has not shown that DSS regarded him as being substantially limited by that condition in working in a broad class of jobs. Plaintiff alleges he was told he was too dangerous to be working at DSS, not at any similar job. While DSS may have regarded plaintiff as substantially limited in his specific job at DSS, though it is admitted even that is in dispute, there is no evidence DSS believed plaintiff to be substantially limited in a broad class of jobs. Plaintiff contends that a jury could infer this meant that DSS that regarded him as unable to work at any job, but this inference undermines the plain words plaintiff has attributed to the speaker, and, perhaps more importantly, the events occurring after the alleged statement.

16. For the purposes of discussion only, it is assumed, but not decided, that working is a major life activity under the ADA. *See Sutton*, 527 U.S. at 492, 119 S.Ct. 2139 (expressing reservations as to whether working can be considered a major life activity within the meaning of the ADA).

17. *See, e.g., Sullivan v. River Valley School District*, 197 F.3d 804, 810 (6th Cir.1999) ("a defendant employer's perception that health problems are adversely affecting an employee's job performance is not tantamount to regarding that employee as disabled"); *Cody,*

139 F.3d at 599 ("A request for an evaluation is not equivalent to treatment of the employee as though she were substantially impaired. Employers need to be able to use reasonable means to ascertain the cause of troubling behavior without exposing themselves to ADA claims...").

18. *See, e.g., Kramer*, 142 F.Supp.2d at 560 (defendant employer's offer to grant employee leave of absence is insufficient to demonstrate employer regarded employee as disabled under the ADA).

Plaintiff continued his employment at DSS after the comment was made. Even though plaintiff claims DSS began its vendetta against some time after this comment, he was not fired, *see Roberts v. New York State Dept. of Correctional Services,* 63 F.Supp.2d 272, 288 (E.D.N.Y.1999) (continued employment belies notion that a person is "regarded as" having a substantially limited disability) (citing *Giruzzi v. Blue Cross/Blue Shield of Utica–Watertown, Inc.,* No. 97–CV–0078, available at 1998 WL 690981, at *5 (N.D.N.Y. Sep.30, 1998)), and plaintiff has not shown through other evidence that DSS regarded him as substantially limited from working in a broad class of jobs. Thus, DSS' motion for summary judgment on plaintiff's *second* cause of action is granted, and the claim is dismissed with prejudice.

### B. *New York Human Rights Law Claim*

In plaintiff's *fifth* cause of action, he alleges he was constructively discharged because of his disability in violation of New York Human Rights Law, N.Y. Exec. Law § 296(1)(a). Though New York courts also utilize the burden-shifting framework outlined in *McDonnell Douglas* in state disability discrimination claims, the analysis under that framework differs in significant respects from that used for ADA claims. To establish a *prima facie* case of disability discrimination, the plaintiff bears the burden, albeit *"de minimis,"* of demonstrating that: 1) he is disabled; 2) he was actually or constructively discharged; 3) he was qualified to hold the position from which he was discharged; and 4) the discharge occurred under circumstances giving rise to an inference of unlawful disability discrimination. *See Ferrante v. American Lung Ass'n.,* 90 N.Y.2d 623, 629, 665 N.Y.S.2d 25, 687 N.E.2d 1308 (1997); *Rosen v. Thornburgh,* 928 F.2d 528, 532 (2d Cir.1991). The bur-

den on plaintiff is indeed light, and the evidence required to demonstrate the prima facie case is "infinitely less than what a directed verdict demands." *St. Mary's Honor Center v. Hicks,* 509 U.S. 502, 515, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993); *see also McGuinness v. Lincoln Hall,* 263 F.3d 49, 53 (2d Cir.2001) (collecting cases). Plaintiff has provided sufficient evidence to satisfy his *prima facie* burden. With respect to the third prong, no evidence has been presented that suggests he is not qualified to hold the position from which he was discharged. The parties dispute, however, whether plaintiff can satisfy the remaining prongs, and they will all be addressed in turn.

### 1. *"Disability"*

Despite a wealth of legislative history which seems to dictate otherwise, a "disability" is defined much more broadly under NYHRL than it is under the ADA. *See Reeves v. Johnson Controls World Services, Inc.,* 140 F.3d 144, 155 (2d Cir. 1998) (citing *State Division of Human Rights v. Xerox Corp.,* 65 N.Y.2d 213, 218, 491 N.Y.S.2d 106, 480 N.E.2d 695 (1985); *Ditullio v. Village of Massena,* 81 F.Supp.2d 397, 409 (N.D.N.Y.2000) (same). Specifically, the statute defines "disability" as: (a) a physical, mental or medical impairment resulting from anatomical, physiological, genetic or neurological conditions which prevents the exercise of a normal bodily function or is demonstrable by medically accepted clinical or laboratory diagnostic techniques or (b) a record of such an impairment or (c) a condition regarded by others as such an impairment... N.Y. Exec. Law §§ 292(21)(a)-(c). Thus, under subsection (a), which serves as a guide to determining disability under subsection (c), a disability is present where a plaintiff's impairment is "demonstrable by medically accepted clini-

cal or laboratory diagnostic techniques," regardless of whether such an impairment "substantially limits a major life activity." *See Reeves*, 140 F.3d at 155; *Xerox Corp.*, 65 N.Y.2d at 218–19, 491 N.Y.S.2d 106, 480 N.E.2d 695.

Though plaintiff fails to specify which subsection he is proceeding under, it seems clear that his condition could fall under either subsection (a) or (c) of NYHRL's broader disability definition. Plaintiff had bipolar depression, which is a mental impairment. DSS makes no attempt to argue that such an impairment is not "demonstrable by medically accepted clinical ... techniques." Because plaintiff was diagnosed with the disorder by a licensed psychiatrist, he fits within subsection (a). Even if, as DSS seems to argue, plaintiff did not have bipolar disorder, and instead had "[d]epressive disorder" or "social anxiety disorder," the result is the same. DSS, as the moving party, does not allege, much less prove, that both are not "demonstrable by medically accepted clinical ... techniques."

Plaintiff is also "disabled" under subsection (c). DSS does not dispute that it knew of plaintiff's disorder, no matter what that disorder was. DSS, again, does not dispute, or present any evidence not suggesting, that any of the possible disorders can be demonstrated by a medically accepted diagnosis. Thus, plaintiff is "disabled" within the meaning of NYHRL.

The oddity thus produced, that plaintiff is clearly not disabled under the ADA, but, using the same facts, clearly is under NYHRL, highlights the striking contrast between the definitions of disability. While reservations about NYHRL's all-encompassing definition may be justified, altering, or in the case of courts, departing from, the statutory language, is a task better left to the appropriate governmental bodies in New York State.

### 2. *Constructive discharge*

As noted, plaintiff carries a *de minimis* burden to show he was actually or constructively discharged. An employee is constructively discharged when the employer "deliberately [makes] his working conditions so intolerable that he [is] forced into an involuntary resignation." *Kirsch v. Fleet Street, Ltd.*, 148 F.3d 149, 161 (2d Cir.1998) (quoting *Pena v. Brattleboro Retreat*, 702 F.2d 322, 325 (2d Cir. 1983)). To prove that working conditions were "intolerable," and not merely unpleasant or difficult, *Martin v. Citibank, N.A.*, 762 F.2d 212, 221 (2d Cir.1985), a plaintiff must demonstrate that a reasonable person subjected to the same conditions would have felt compelled to resign from the position. *see Ternullo v. Reno*, 8 F.Supp.2d 186, 190 (N.D.N.Y.1998); *Chertkova v. Connecticut General Life Ins. Co.*, 92 F.3d 81, 89 (2d Cir.1996); *Fischer v. KPMG Peat Marwick*, 195 A.D.2d 222, 607 N.Y.S.2d 309, 311 (N.Y.App.Div.1994). Because "[c]ertain factors, standing alone are legally insufficient to support constructive discharge," the cumulative effect of adverse conditions is properly considered. *Chertkova*, 92 F.3d at 90.

It goes without saying that summary judgment is precluded on whether plaintiff was constructively discharged. It is difficult to think of a more appropriate situation for an employee to feel compelled to resign than one where an employer allegedly prompts the employee's seizure and involuntary confinement. Returning to work following such seizure and confinement, believing the blood from such deprivations to be on the hands of the very institution to where the employee returns, is tantamount, at least for the purposes of plaintiff's *de minimis* burden at this stage of the litigation, to intolerable working conditions. In addition, when viewing the

evidence cumulatively and taking the facts in the light most favorable to the nonmovant, plaintiff was informed that he was too dangerous to be working at DSS. *See Harrison v. Indosuez*, 6 F.Supp.2d 224, 231 (S.D.N.Y.1998) (comments to plaintiff about not "want[ing] a nut case in [the] trading room," and that things would get "messy" if plaintiff did not assume disability status, helped support rejection of employer's summary judgment motion on constructive discharge claim). In effect, DSS is arguing that being told he cannot work somewhere because he is too "dangerous," and subsequently having him swiped from his home and confined in a mental hospital, would not compel plaintiff to resign.

Indeed, this is not merely a situation where plaintiff "disagreed with [DSS'] criticisms of the quality of his work, or did not receive a raise, or preferred not to continue working for [DSS]." *Spence v. Maryland Casualty Co.*, 995 F.2d 1147, 1156 (2d Cir.1993). He believed the very people responsible for employing him, that he had to face each day, had just had him arrested, taken to a hospital in handcuffs, and involuntarily detained over a period of days, all on a belief which he and perhaps others thought was clearly unwarranted. Taking all facts as alleged by plaintiff as true, the burden is clearly met on this element of the *prima facie* case.

### 3. *Inference of discrimination*

In order to meet the fourth prong of the prima facie case, plaintiff must present sufficient evidence allowing a reasonable finder of fact to conclude he was "discharged because of [his] disability." *Ryan*, 135 F.3d at 870. "[T]here is no unbending or rigid rule about what circumstances allow an inference of discrimination when there is an adverse employment decision." *Chertkova*, 92 F.3d at 91.

Thus, plaintiff is not absolutely required to demonstrate that his position was filled by someone without a disability. *Id.*

Assuming as true for summary judgment purposes, as a court is required to do, that DSS participated in the scheme to pick up and confine plaintiff and is attributed the comment made to plaintiff that he is too dangerous to work, and that such participation and comment effectively discharged plaintiff, there is little doubt that the actions constituting the discharge were taken on the basis of plaintiff's disability. This is not to say that this is all the evidence plaintiff will try and prove at trial in support of his disability discrimination claim. These factual allegations alone, however, are enough to sustain plaintiff's burden at this stage of the litigation.

Any argument that the actions taken were done so out of fear for the safety of DSS employees, and not on the basis of plaintiff's disability, is quite suspect. It is doubtful plaintiff would have been picked up and confined in a mental hospital had DSS not known he had bipolar disorder. He may have been picked up, or at least questioned, if the threat were reported to the authorities, but he would not have been involuntarily admitted to a mental hospital had it not been for his disorder. Obviously, that did not happen. Instead, the very scheme used in the pick-up and confinement necessarily requires belief that a person has a mental health disorder. He was picked up and confined pursuant to the *Mental Hygiene* Law. It is likewise clear that participation in the scheme was informed by knowledge of plaintiff's condition. Townsend and Beckman both admit that at the point when plaintiff was picked up, they both knew of his disorder. Thus, any DSS action in allegedly participating in the scheme to pick up and confine plaintiff was certainly on the basis of, and because of, plaintiff's disorder.

Also, Sharpe's comment, taken as being spoken, is not only erroneous, but is also demonstrative of the type of biased comment that employment discrimination statutes attempt to eradicate. *See Ostrowski v. Atlantic Mut. Ins. Cos.*, 968 F.2d 171, 182 (2d Cir.1992) (" 'stray' remarks in the workplace by persons who are not involved in the pertinent decisionmaking process... may suffice to present a *prima facie* case under the framework set forth in *McDonnell Douglas* ..., and may indeed persuade the factfinder that the plaintiff has carried his or her ultimate burden of persuasion"). It is reasonable for a jury to conclude that the end of plaintiff's employment came about due to discriminatory actions undertaken by DSS.

### 4. The remainder of the McDonnell Douglas framework

Where a plaintiff presents sufficient evidence to satisfy his prima facie case of disability discrimination, a presumption of unlawful discrimination arises, and the burden of production shifts to the defendant to articulate a legitimate, non-discriminatory reason for its actions. *McDonnell Douglas*, 411 U.S. at 802, 93 S.Ct. 1817; *McGuinness*, 263 F.3d at 55. If the employer can articulate such a reason, the presumption is rebutted, and the burden shifts back to the plaintiff to demonstrate that the legitimate reasons so articulated were not the true reasons for the discriminatory action, but rather a pretext for discrimination. *See Roge v. NYP Holdings, Inc.*, 257 F.3d 164, 168 (2d Cir. 2001).

Here, DSS has not specifically stated its reason in this context, because it argued assuming plaintiff could not establish his *prima facie* burden. Regardless, the record amply demonstrates that DSS is arguing that the decision it made, to allegedly participate in the scheme to pick up and involuntary confine plaintiff, was out of fear for the safety of its employees. This reason is sufficient to sustain the burden of production. And, as has been already discussed, plaintiff has properly sustained its burden of showing that the jury could conclude that the reasons of DSS, for taking its actions, were not its true reasons. Thus, DSS' motion for summary judgment on plaintiff's *fifth* cause of action must be denied.

### IV. REMAINING STATE LAW CLAIMS

■ Plaintiff's remaining state claims, as briefed by the parties, include the alleged violations of his right to confidentiality in and access to his medical records, and a claim for lost wages. It is completely unclear under which cause of action the first two claims fall, though they likely fall under plaintiff's claim that certain defendants breached a duty of care to him by not complying with the Mental Hygiene Law mandates.[19] Thus, the claims will be evaluated under plaintiff's *sixth* cause of action.

### A. Confidentiality of Medical Records

■ Plaintiff asserts that Benedictine violated his right to confidentiality of his

---

19. Alleged violations of the right to access medical records do not fall within the ambit of procedural due process, *see Gotkin v. Miller*, 514 F.2d 125, 128 (2d Cir.1975) (finding "no basis for the proposition that mental patients have a constitutionally protected property interest in the direct and unrestricted access to their [psychiatric] records"), and although the Second Circuit has recognized a "qualified constitutional right to confidentiality of medical records," *Quinones v. Howard*, 948 F.Supp. 251, 254 (W.D.N.Y.1996) (citations omitted), plaintiff does not claim that the nature of his claim is constitutional. Thus, the alleged violations cannot be maintained under plaintiff's due process claims in his *first, third,* and *fourth* causes of action.

medical records by informing Beckman of clinical information. "The public has a significant interest in protecting the confidentiality of medical records in general, and of psychiatric records in particular." *Schwenk v. Kavanaugh*, 4 F.Supp.2d 116, 117 (N.D.N.Y.1998). The interest in confidentiality is premised on the notion that "[t]he patient whose privacy and sensibilities are safeguarded will be more likely to reveal information that will result in improvement or cure. This benefits the individual and, in turn, the community and, ultimately, the population." *Wheeler v. Commissioner of Social Services of the City of New York*, 233 A.D.2d 4, 662 N.Y.S.2d 550, 553 (N.Y.App.Div.1997). "Having pioneered the use of statutes to protect the confidentiality of medical records, New York has been zealous in safeguarding those privacy concerns." *Id.* (citing, inter alia, Mental Hygiene Law §§ 33.13, 33.16).

Mental Hygiene Law § 33.13 embodies these principles. The statute requires the maintenance of a clinical record for each psychiatric patient at Benedictine Hospital. A "clinical record" must "contain information on all matters relating to the admission, legal status, care, and treatment of the patient or client, and shall include all pertinent documents relating to the patient or client." Mental Hygiene Law § 33.13(a). The statute mandates that this information may not be released to any person or agency, except to, *inter alia*, "an endangered individual and a law enforcement agency when a treating psychiatrist or psychologist has determined that a patient or client presents a serious and imminent danger to that individual," or "to a director of community services . . ., provided that such director or his designee requests such information in the exercise of his statutory functions, powers and duties pursuant to [other relevant sections]

of this chapter." Mental Hygiene Law § 33.13(c)(6) and (12).

Here, plaintiff did not consent to any information about him being disclosed to any party. The only documents relevant to this issue are the consent forms plaintiff signed. A preliminary issue is whether plaintiff had capacity to consent, if he is, in fact, found to be mentally ill at the time of the events in question. As noted earlier, consistency with defendants' contention that plaintiff was so mentally ill as to be an immediate danger seems to mandate that plaintiff would not have capacity to consent. Because he did not have capacity, then obviously any consent to information being divulged to DMH or DSS is nullified. Even if he did have capacity, there is still clearly no consent as to DSS. His explicit direction—"DSS is not allowed to receive any information about me at all"—clearly prohibits DSS from receiving any information about him. Thus, it is clear that, under any set of circumstances, plaintiff did not consent to disclosure of his clinical information.

Nevertheless, this is not to say that summary judgment in plaintiff's favor is appropriate on this claim. Factual questions exist as to whether information was in fact disclosed to an inappropriate party, and as to whether such information was clinical. Further, even assuming that clinical information was disclosed, factual questions remain as to whether such disclosure was appropriate. Specifically, because there is a dispute as to whether plaintiff was dangerous by virtue of a mental illness, so as to properly compel his involuntary admission to Benedictine, any reasons for disclosure cannot yet be properly analyzed. Summary judgment on this claim is therefore denied.

## B. *Access to Medical Records*

■ Plaintiff also alleges that he was improperly denied access to his medical

records following his release from Benedictine. Barring the existence of actual litigation, there is no constitutional or common law right to direct and unrestricted access to medical records, *Gotkin,* 514 F.2d at 125; *Wheeler,* 662 N.Y.S.2d at 554. The failure to grant unrestricted access stems partly from the fear of the psychological consequences such disclosures would have on patients.[20] *Cynthia B. v. New Rochelle Hosp. Medical Center,* 60 N.Y.2d 452, 459, 470 N.Y.S.2d 122, 458 N.E.2d 363 (1983). Counseling against unrestricted access is the particularly worrisome "danger for 'self-fulfilling diagnoses' ... in cases where homicidal or suicidal tendencies have been diagnosed." *Id.* at 460, 470 N.Y.S.2d 122, 458 N.E.2d 363. Thus, the New York Court of Appeals, in the context of a custodian of hospital records seeking a protective order barring disclosure, advised that a treating doctor should have an opportunity to review a request for access so as to ensure no danger accrues to the patient or others from such disclosure. *Id.; see also Wheeler,* 662 N.Y.S.2d at 555 (stating that disclosure of psychiatric/psychological records is particularly sensitive, not just to patients but to third parties as well).

Cognizant of these concerns, Mental Hygiene Law §§ 33.13 grants to patients a restricted right to access their medical records. Upon the written request of the patient, the facility, in this case Benedictine, must "provide an opportunity, within ten days, for such [patient] to inspect any clinical record concerning or relating to the examination or treatment of such [patient] in the possession of the facility." Mental Hygiene Law § 33.16(b)(1). This opportunity, however, is subject to the approval of the treating practitioner. The treating practitioner must allow the review or copying of the clinical record unless the practitioner determines that such review "can reasonably be expected to cause substantial and identifiable harm to the patient or client or others which would outweigh the [patient's] right of access to the record." *Id.;* Mental Hygiene Law § 33.16(c)(3). Where such a determination is made, "the [patient] shall be informed by the facility of such denial, and of the [patient's] right to obtain, without cost, a review of the denial by the appropriate clinical access review committee." Mental Hygiene Law § 33.16(c)(4).

As was the case with the confidentiality to medical records, material factual disputes preclude determining as a matter of law whether plaintiff's right to access his records was violated. There appears to be no dispute that plaintiff made his initial request for his medical records on May 1, 1998. A factual question exists as to whether such request was in writing, as is required by the statute, and whether such request for his entire medical records. If it was, then the hospital was bound to give plaintiff at least a response within ten days. If it was not, then the first proper request for the records did not

---

20. Though the court in *Wheeler* could find "no instance where a court denied access on those grounds," 662 N.Y.S.2d at 555, the Court of Appeals in *Cynthia B.* highlighted the potential of such danger: "Medical records, particularly psychiatric records, will often contain intimate details of past acts, hopes, fantasies, shames, and doubts that were divulged during treatment. Clinical studies of patients' reactions to reading their psychiatric records have cited the danger of misconceptions and misunderstandings about the material because of the technical medical terminology often employed in the records, and have suggested that knowledgeable staff should be available when a chart is read to provide explanations. It is obvious that the psychological response of a patient to reading his or medical record is generally more critical in the context of mental illness than in treatments for physical ailments." 60 N.Y.2d at 459, 470 N.Y.S.2d 122, 458 N.E.2d 363.

occur until June 24, 1998, when plaintiff's attorney requested in writing the statutory section under which plaintiff was confined and a confirmation that no other medical records existed, or on July 6, 1998, when plaintiff's attorney demanded in writing the remainder of plaintiff's medical records. Which date the first request was is a question for the jury. A factual question also exists with regard to whether plaintiff received the whole medical record or part of it.

Though Puglisi concedes that plaintiff's initial request for his medical records occurred on May 1, 1998, she claims she, as treating practitioner, did not receive it and sign for it until June 2, 1998. Thus, a factual question as to when Puglisi received the report must be determined before determining if she complied with the statutory timeline for responding. Finally, plaintiff alleges he was not informed of his right of review of Puglisi's decision to release only part of his record, as is required by the statute. As noted above, it is unclear if plaintiff actually asked for his entire medical record. If he did not, and Puglisi released everything he did ask for, then giving plaintiff notice of his right to review the decision is moot. One is hard pressed to come up with a reason as to why someone would want a review of a request that was granted. Thus, sufficient factual questions prevent ruling on this issue as a matter of law.

### C. LOST WAGES

██ Among the various other forms of relief requested by plaintiff is a claim for lost wages. Plaintiff claims the ordeal he was put through prevented him from earning $1000 to $2000 dollars pursuant to a handyman business. Recovery may not be had for lost wages that are speculative. See Church v. Steller, 35 F.Supp.2d 215, 221 (N.D.N.Y.1999) (citations omitted).

Here, plaintiff has presented insufficient and entirely speculative evidence to demonstrate that he suffered lost wages by the actions of the defendants. Therefore, no relief will be afforded for lost wages.

### V. CONCLUSION

For the foregoing reasons, viewing the facts in the most favorable light to the non-moving party, genuine issues of material fact remain as to whether defendants are state actors, as to whether the statutory mandates regarding involuntary commitment were complied with, including whether it was proper to arrest and then confine plaintiff, as to whether plaintiff was constructively discharged in violation of New York Executive Law, and as to whether plaintiff's rights to confidentiality to his medical records and access to his medical records were violated.

Accordingly, it is

ORDERED that

1. Plaintiff's motion for partial summary judgment on the *first, third, fourth* and *sixth* causes of action is DENIED;

2. Defendants', Dr. Kevin Smith and Dr. Diana Puglisi, motion for summary judgment is GRANTED in part and DENIED in part;

3. Defendants', Dr. Kevin Smith and Dr. Diana Puglisi, motion for summary judgment on plaintiff's claim for lost wages is GRANTED;

4. Defendants', Dr. Kevin Smith and Dr. Diana Puglisi, motion for summary judgment on the *first, third, fourth* and *sixth* causes of action is DENIED;

5. Defendants', Benedictine Hospital, Ruth McGregor, Dr. Joel Ginsberg, and Dr. David Steres, motion for summary judgment is GRANTED in part and DENIED in part;

6. Defendants', Benedictine Hospital, Ruth McGregor, Dr. Joel Ginsberg, and Dr. David Steres, motion for summary judgment on plaintiff's claim for lost wages is GRANTED;

7. Defendants', Benedictine Hospital, Ruth McGregor, Dr. Joel Ginsberg, and Dr. David Steres, motion for summary judgment on the *first, third, fourth* and *sixth* causes of action is DENIED;

8. Defendants', Ulster County Department of Social Services, Ulster County Department of Mental Health, Marshall Beckman, and Ernest Townsend, motion for summary judgment is GRANTED in part and DENIED in part;

9. Defendants', Ulster County Department of Social Services, Ulster County Department of Mental Health, Marshall Beckman, and Ernest Townsend, motion for summary judgment on the *first, third, fourth,* and *fifth* causes of action is DENIED; and

10. Defendant's, Ulster County Department of Social Services, motion for summary judgment on plaintiff's claim for lost wages and on the *second* cause of action is GRANTED, and the *second* cause of action is dismissed with prejudice.

The remaining causes of action are the *first, third,* and *fourth* as against all defendants, the *fifth* as against defendant Ulster County Department of Social Services, and the *sixth* as against Benedictine Hospital, Ruth McGregor, Dr. David Steres, Dr. Joel Ginsberg, Dr. Kevin Smith, and Dr. Diana Puglisi.

IT IS SO ORDERED.